No. 12,778.

GEORGE H. DIECK VS. NEW ORLEANS, CITY & LAKE RAILROAD COMPANY.

## SYLLABUS.

The authorities are numerous, and uniform to the effect that a person whose business or pleasure occasions him to use the streets of a city which are traversed by electric cars, and particularly at street crossings, is guilty of negligence if he fails to employ proper precautions for his safety.

He is bound to look and listen for the approach of cars, and to exercise ordinary care and caution to avoid possible danger of a collision; and should he see an approaching car in close proximity, it would be his plain duty to halt until same could pass by, rather than run the risk of an accident by attempting to cross the track in front of it.

Failing to take such necessary precautions for his safety, the injured party is guilty of that negligence which deprives him of the right to reimbursement for injury received.

ON APPEAL from the Civil District Court for the Parish of Orleans. *Rightor, J.*

*Edgar M. Cahn* and *Branch K. Miller* for Plaintiff and Appellee.

*Denegre, Blair & Denegre* for Defendant and Appellant.

Argued and submitted May 6, 1898.
Opinion handed down November 21, 1898.
Rehearing refused February 6, 1899.

The opinion of the court was delivered by

WATKINS, J.   This suit is by the plaintiff, in his own right, claiming damages of the defendant in the sum of twenty-five thousand dollars, for the injuries he received in a collision which occurred on Royal street, in the city of New Orleans, on the 8th of April, 1897, between one of the defendant's electric cars and a cart in which he was at the time driving, the same being drawn by a mule.

The case was tried by a jury, who rendered a verdict in favor of the plaintiff for five thousand dollars; and from a judgment thereon rendered, the defendant has appealed.

There was an extended and elaborate motion for a new trial filed, but same was, by the judge a quo, promptly overruled, who made this unique observation, viz:

"As I make it a rule in jury cases of this kind not to grant new trials, this application is denied."

The plaintiff's petition substantially makes the following statement of the way in which the accident happened, viz:

That he was driving a cart, drawn by a mule, along Congress street, approaching its intersection with Royal street, "intending to cross the latter," and that when his cart "had reached the intersection of said two streets, and was in the act of crossing Royal street, he observed, half a square off, a car of the said company's line, operated on said street, approaching with great rapidity from the direction of Poland street, or down town."

"That then and there observing that the speed of the car was excessive, and that no signal of approach (was given), nor any attempt to check the same was made by the motorman thereof, (he) turned his mule in the direction of Canal street in order to escape what seemed to be an impending collision;" same being solely due to the fault and negligence of the motorman of said car, "the approach of which having been observed by him when it was at least half a square from the intersection of the said two streets.

"That said car could have been stopped, or its speed so checked, as to avoid injury to the plaintiff, had the motorneer thereof made any attempt to do so, but, on the contrary, no effort was made by the

latter to avoid collision with him, or the vehicle in which he was riding, by reason of which the said car, propelled at an unlawful rate of speed, came in violent collision with the said cart, throwing him therefrom to the ground," etc.

That in falling one of his arms was caught and held fast in some of the appliances underneath the car, whereby he was dragged for the distance of three-quarters of a square, and that said car continued its rapid motion, after the collision, for that distance.

That he then and there received serious and severe injuries particularly in his left leg, which was severely lacerated and broken, in consequence of which it was amputated.

That he then and there suffered serious and great physical and mental pain, which has continued with greater or less severity.

That his occupation was that of a laborer, in which his earning capacity has been greatly diminished by the loss of his leg, he being made a cripple for life.

That he is a man of family, having a wife and five children, who are solely dependent upon him for a support.

The answer is a general denial, coupled with a charge of contributory neglect.

The case presented is that of a man riding in a cart, drawn by a mule, going along a street of the city which is laid at right angles with another street, on which is laid the track of the defendant, and which is traversed, at frequent intervals, by its electric cars; and in order to arrive at his destination, it had to be driven across the latter at the point of the intersetion of the two streets.

The plaintiff having driven his cart into the street occupied by the defendant, observed one of its electric cars at a distance of about a half a block and approching with a great rapidity, attempted to turn his mule and cart into the street the car was passing, and in the direction of Canal street; and by reason of the great velocity of the car, and the failure of the motorneer to attempt to check the same, a collision between the cart and car took place, whereby the accident ensued and the serious and irreparable injury was inflicted.

We make the following extracts from the summary of the evidence which plaintiff's counsel gives in his brief, viz:

"Congress and Royal streets are situated at right angles and cross each other at the point where the casualty occurred. Plaintiff was coming in his wagon along Congress street, from the direction of the

lake, toward the river; his course lay across the intersection of the two streets; he was struck by the car a few feet above Congress street, while attempting to avoid being collided with, by turning up Royal street, in a direction the same as the car was coming from. Plaintiff says that when he approached the corner he listened to hear if the car was coming; he heard neither sound nor gong, so he continued far enough to look down the street and see whether a car was in sight; he saw the car in question half a square away, coming at full speed; he was then on the wood's side of Royal street, coming out Congress street, toward the river; the head of his mule was then over the rail of the track on the wood's side, or towards the direction from which plaintiff was coming; he looked down the street for the car, when the head of his mule was over the rail; the car was coming at full speed; he raised his hand and gave a signal for the car to stop, after which he headed his mule towards Canal street; he turned up the street because he could not make the crossing in time; the collision occurred; he was knocked off his cart, and was not conscious until some time afterward; when his senses returned, he found himself holding to the car, underneath, near the hind wheel, three-fourths of a block away from Congress street; he was taken from underneath the car, and carried by the ambulance to the hospital, where his left leg was amputated about three inches above the knee." Brief, p. 3.

The further statement is of similar purport, viz:

"As he approached Royal street he was standing in the cart at a point in the rear of the axle, about the middle of the cart, as drivers usually do. When he first saw the car he was at the foot of the crossing of Congress street, on the wood's side of Royal street. The front foot of the mule was then over the rail. It was there that he changed the direction in which he was going, and when the collision occurred, the wheels of his wagon were on the crossing.

"It was not until then that he could look down Royal street, clear of the buildings at the corner. His wagon was struck while it was going toward Canal street, after he had completed, or partially completed, the turn he intended to make. His left wheel was then on the track. The building on the lower side of Congress street, at the corner, prevented his seeing the car until he reached the point at which he did see it. He did not stop at the corner before being able to look down Royal street, because he heard no gong sounded. His mule was going

266 SUPREME COURT OF LOUISIANA.

Dieck vs. N. O., City & Lake R. R. Co.

in an ordinary walk. He listened for a gong from within half a square of Royal street.

"There was nothing to have prevented the motorneer from seeing his mule when he cleared the buildings at the corner."

On the other hand, the contention of the defendant's counsel is as follows, viz:

"Defendant, on the other hand, contends that absence of negligence or fault, on its part, is clearly established. The great weight of the evidence shows; (1) That the gong was rung before approaching the crossing; (2) that the car was not running at an unlawful or excessive rate of speed; (3) that the brakes and the equipment provided for stopping the car were in good order; (4) that as soon as the motorman saw, or could have seen, from plaintiff's actions that he was going to attempt to cross the track, every efffort was made to stop the car and prevent a collision, but it was impossible to stop in time to avoid the accident; (5) that, considering the distance of the car from the place of the accident when plaintiff's cart emerged from Congress street, it was impossible to prevent the accident by stopping the car. Defendant claims, moreover, that plaintiff's contributory negligence is demonstrated by the nature of the locality, as shown by the maps and photographs in evidence, and is established, not only by defendant's evidence, but by the testimony of plaintiff, and of every one of plaintiff's witnesses who saw the accident." Brief, p. 4.

The following additional extract from the defendant's brief, gives measurement and distances which are instructive, viz:

"The car in question was coming down Royal street toward Canal street. The map gives the dimensions of the streets and banquettes. For instance, from the Royal street property line, on the lower woods corner of Royal and Congress streets, to the street edge of the gutter, is eight feet ten inches; from that point to the rail nearer the woods is ten feet two inches; width of track is five feet two and one-half inches; from river rail to gutter, on river side on Royal street, is eleven feet six inches; and from gutter to property line is nine feet. The map marked "Tutweiler 2" shows the same locality, but takes in Royal street for one block of its intersection with Congress street. The important fact shown on this map is that the block below the intersection of Congress and Royal, i. e., the block bounded by Independence and Congress, is a very short block, only one hundred and ninety-seven feet in length; and that a person on Congress street,

twenty-one feet six and one-half inches from the woods rail of the railroad track, could see a car coming down Royal street when it was a block a way; that when the car was half of the block away it could be seen from a point on Congress street, twenty-four feet and one-half inch from the woods rail of the track; and, of couse, the nearer the car was to the crossing, the greater the distance from the track it could be seen by one coming out Congress street toward the river. The width of Congress street is twenty-eight feet one inch. It is a planked road." Brief, p. 6.

Consequently the result of the foregoing measurement is that the distance from the property line at the corner of Royal and Congress streets, to the rail of defendant's track on the woods side of the street, is nineteen (19) feet; and the width of the track between the rails being five feet and two and one-half inches, it would have been necessary for the plaintiff's wagon to have moved a distance of twenty-four feet and two and one-half inches in order to clear the track; and possibly a distance of three additional feet for clearance space, *i. e.,* a distance of fully twenty-seven feet and two and one-half inches, in order to have passed beyond a point of possible contact with the car of defendant, and thus avoided a collision. Shreveport and Red River Valley Railway Company vs. St. Louis Southwestern Railway Company, 51 An. 424.

It is claimed, further, that the block below Congress street—that is to say, the block between Congress and Independence streets—is only one hundred and twenty-seven (127) feet in length, and that a person on Congress street, twenty-one feet and six and one-half inches (21 feet 6 1-2 inches) from the rail of defendant's track, on the woods side thereof, could see a car coming down Royal street when it was a block distant. That when a car is half a block distant, it can be seen from a point on Congress street twenty-four (24) feet distant from said rail.

That the nearer the car is to the crossing, the easier it could be seen.

From the map in evidence, as well as from other evidence in the record, it appears that Congress street is floored or covered with plank, and that it is twenty-eight (28) feet in width; and that there is on the down-town side of it a banquette, or sidewalk, laid with brick, which is nine feet six inches (9 feet six inches) in width.

A diagram, which is in evidence, shows all the foregoing distances,

by actual measurement, to be as they are stated in the foregoing extract from the defendant's brief.

With this *data* kept in view, a brief synopsis of the testimony can be more understandingly made.

The plaintiff's statement is, that the collision occurred on Thursday, the 8th of April, 1897, between the hours of three and four o'clock in the afternoon.

That he was proceeding down Congress street in the direction of the river, and when he got near Royal street he was listening to hear if a car was coming, and hearing no gong, he drove on "far enough to look down the street to see whether a car was coming, and when he looked he saw a car half a square away coming at full speed."

At that time his mule's head was over the woods-side rail of the track, heading towards the river; and that he then signaled the motorneer to stop his car, and at the same time headed his cart toward Canal street in an effort to avoid a collision with the car.

He says, that the point of contact was between the hub of the wheel and the mule. "That was the portion of the cart that received the blow."

The one he was driving was a two-wheeled cart.

It was empty, and he was going to the river for a load. That he was standing up driving the mule.

"Q. So that your wagon, when you first saw the electric car, was between the two banquettes of Congress street?

"A. It was between the two banquettes on Congress street.

"Q. That is where your cart was when you first saw the electric car?

"A. Yes."

He states that his mule was going in a walk at the time.

Then the following interrogation occurred, viz:

"Q. Now, at what rate of speed were you going, in a walk. or a trot?

"A. I was going in a walk.

"Q. Your mule was walking?

"A. Yes.

"Q. And you mean to say you walked your mule right up on the track, before you saw the car coming?

"A. Yes.

"Q. Now, although you saw the car when it was half a square off,

and your mule's head was simply over the track, you say you could not. turn to get out of the way?

"A.  No; I could not."

The statement of one of the plaintiff's witnesses is, that at the time of the accident he was present and witnessed it.  He said he was working at the corner of Congress and Royal streets, and had just finished some paving, and was going down town, when he saw an electric car coming in the second block below.  That he then walked across the street to where his brother was.

"Then Mr. Dieck came out Congress street.  And when the car was about a half a block below Congress street, I hollowed at Mr. Dieck to get over the track.

"Q.  Where was Mr. Dieck then?

"A.  He was about three feet from the rail.  I don't know whether Mr. Dieck heard me or not.  I can not tell you that.  At the same time the car came on and Mr. Dieck went ahead, and I saw him turn his mule up town when the electric car struck him; and Mr. Dieck fell back out of his cart.

"Q.  How far was the electric car from the corner when you saw Mr. Dieck coming out Congress street with his cart?

"A.  About a half a block; and when Mr. Dieck reached about ten feet away from the track I hallowed at him.  He was about ten feet from the track when I hallowed at him.

"Q.  When you hallowed at him, you say he was ten feet from the track?

"A.  Yes.

"Q.  What I want to know is, how far was the car from the corner when Mr. Dieck's mule and cart reached the track?

"A.  It was about a quarter of a block away."

This witness states that the car was running very rapidly, and did not stop; and that he heard no gong rung.  And that after the collision occurred, the car ran the distance of three-quarters of a block before it halted.

He says there were two little boys in the wagon, and he saw them tumble out and run away.

The following occurred on cross-examination, viz:

"Q.  When you first saw the cart what was it doing; was it running along?

Dieck vs. N. O., City & Lake R. R. Co.

"A. Mr. Dieck was in the cart, and was running along coming toward the river.

"Q. At what gait was it going?

"A. He was just walking along the street, just like you drive a mule.

"Q. Was it walking fast or slow?

"A. Well, you can make a mule walk fast or slow.

"Q. Was he walking fast or slow?

"A. Neither fast nor slow.

\*      \*      \*      \*      \*      \*      \*

"Q. And you say he was ten feet from the rail when you hallowed at him?

"A. Yes.

"Q. Did he not give his mule the whip then?

"A. No; I never saw him give the mule the whip.

\*      \*      \*      \*      \*      \*      \*

"Q. Was he not looking straight ahead?

"A. When I hallowed to him he was looking straight ahead.

\*      \*      \*      \*      \*      \*      \*

"Q. You can stop a mule going in a walk within ten feet?

"A. Yes; or two or three feet if he goes in a walk.

\*      \*      \*      \*      \*      \*      \*

"Q. Did you say, when you hallowed at Mr. Dieck, you were within two steps of his cart?

"A. I was right along side of the gutter, and he passed in the middle."

At that time he was about ten feet from the track.

The brother of the witness last mentioned, in the course of his interrogation, said, viz:

"Q. Did you notice the cart when the head of the horse had reached the track?

"A. Yes.

"Q. How far was the car then to the crossing?

"A. Well, they were not more than ten feet apart.

"Q. You are sure of that?

"A. Yes.

\*      \*      \*      \*      \*      \*      \*

"Q. Now, when the head of Mr. Dieck's mule was on the track, had

the car reached Congress street, or was it ten feet away from Congress street?

"A. It was about ten feet from the rail when he was trying to turn the mule.

"Q. You have stated that the car was ten feet away when Mr. Dieck reached the corner?

"A. I was there when the whole thing was passing; I was standing right there."

This witness having stated, on cross-examination, that the plaintiff was standing in his cart, driving his mule at a slow walk, with the rim of his hat turned down, at the time he shouted at him, the following interrogation occurred upon his re-examination, viz:

"Q. Now, put your hat on and show us how Mr. Dieck had on his hat when you saw him on his cart?

"A. This way (witness putting on his hat and pulling down the rim).

"Q. Was Mr. Dieck holding his head down?

"A. Yes.

"Q. Just like you are holding it now?

"A. Yes.

\*          \*          \*          \*          \*          \*          \*

"Q. You did not notice how he held his head, but you noticed how his hat was turned down?

"A. I know his hat was turned down."

With this the re-examination was concluded. Another witness for the plaintiff, who was present and witnessed the accident, made this statement, viz:

"Q. How far was the car from the corner when Mr. Dieck reached the corner?

"A. When I saw the car, he was no more than about eight yards.

"Q. You did not see it before then?

"A. No; I was sitting down; the cars go so fast there."

Again:

"Q. At what rate of speed was the cart going when you first saw it?

"A. When I saw it?

"Q. Yes; how fast was the cart going?

"A. It was walking slow; I told him to stop. ·

"Q. Was that before he got to the track, when you told him to stop?

"A.   Yes.

"Q.   Was he walking slowly before he got to the track?

"A.   He was walking slow all the time," etc.

The statement of another witness who was a passenger on the car, is as follows, viz:

"Q.   How, then, were you able to see that cart when you were a half a block away?

"A.   I was looking right ahead when the thing happened.

"Q.   Did you see it looking out of the car window?

"A.   No; I saw it through the car door.

"Q.   You saw the driver of this cart when the car was one hundred and fifty feet away?

"A.   Yes; I could see exactly when it was one hundred and fifty feet away.

"Q.   I suppose the driver, then, could have seen the cart?

"A.   I don't know.

"Q.   If you could see the driver, why could not the driver look along the same line of vision and see you?

"A.   The man was not looking that way.

"Q.   If he had been looking that way, he could have seen the car?

"A.   Yes; I suppose so."

He says there were twelve or fifteen other persons in the car besides himself.

Again:

"Q.   Did somebody try to turn the brake in the front part of the car?

"A.   Yes; the motorman, I believe.

"Q.   Now, do you know what was the reason why they attempted to turn on the *rear* brake?

"A.   To stop the car.

"Q.   You say they did it because they could not stop the car with the front brake; how do you know that?

"A.   It looked that way.

"Q.   State the facts which make you say it looked that way? etc.

"A.   Well, I saw the motorman try to turn the brake, (but) it looked like he could not shut off the power; and when I walked towards the conductor, I saw somebody turn the *rear* brake."

Another witness who was on the car, confirms the statement of the one last mentioned, thus:

Dieck vs. N. O., City & Lake R. R. Co.

"Q. How far was that car from the corner of Congress street when Mr. Dieck reached the corner of Congress and Royal?

"A. It was fully half a square away.

"Q. You are sure of that?

"A. I am positive.

"Q. What was it you saw a half a square off—the mule or cart, or both?

"A. I saw the mule and cart, and Mr. Dieck and a little boy with him in the cart.

"Q. Are you positive of what you state now?

"A. Yes.

*          *          *          *          *          *          *

"Q. How many feet was it from the corner when you first saw the motorman try to stop the car?

"A. One hundred and twenty, or one hundred and fifty feet."

On cross-examination the following occurred, viz:

"Q. Where was the mule when you first saw it?

"A. It was near the corner.

"Q. He had not quite reached the corner when you first saw it?

"A. Not quite; he was a few feet from the corner.

*          *          *          *          *          *          *

"Q. So he had not yet reached the corner of Congress and Royal streets then?

"A. No; he was a few feet distant from the corner.

"Q. So, he had not yet reached Royal street, when coming out Congress?

"A. Yes.

"Q. From where you were sitting you could see both the mule and the cart?

"A. I could see the whole thing. I jumped up when I realized there was going to be a collision.

*          *          *          *          *          *          *

"Q. In what direction was (Mr. Dieck) looking?

"A. Well, at the time that I saw him, I think he saw the car coming—I saw him looking in the direction of the car.

"Q. Was he going in a walk?

"A. Yes.

"Q. And the mule had not reached Royal street?

"A. Not quite.

16

"Q. So that, the whole distance from Royal street—that is, from the property line of Royal street to the woods side of the rail—was between him and the track at the time?

"A. Well, from the time when I saw him, from the mule's head to the rail, I suppose was eight or nine feet.

"Q. And the mule was going in a slow walk?

"A. Yes.

"Q. And Dieck was looking at the car?

"A. He was looking at the car."

Another passenger on the car stated that, seeing there was about to be a collision, he tried to stop the car by pulling down the trolley.

"Q. Why did you unloose the trolley?

"A. Because I had an idea that that would stop the car.

"Q. Do you know anything else about this collision?

"A. The motorman could not stop the car."

The foregoing is a very fair analysis of the testimony of the plaintiff's witnesses.

The defendant's testimony shows that the motorneer, who was in charge of the car with which the cart came in collision, had been in the employment of the defendant in that capacity for a period of two years, and had the reputation of being both competent and careful, and had never had an accident to happen to his car before.

One of the officers of the company testified as follows, viz:

"Q. What can you say about his character and efficiency as a motorman?

"A. I consider him a first-class man; his record is extremely good."

The testimony shows that at the locality where this accident occurred, the rules governing the company permit a higher rate of speed in the movement of its cars than at localities nearer to Canal street; and that when moving at that rate of speed, a car could be stopped within a distance of one hundred and four feet—or the distance of one-third the length of an ordinary block.

The following is the further interrogation of that officer, viz:

"Q. Is there any rule of the company which forbids, or makes it the duty of the motorneer to ring his gong in the middle of the square; or is it left to his discretion?

"A. It is left to his discretion. We have a rule not to sound the gong unnecessarily.

"Q.  You don't require the motorneer, as an absolute duty, to ring his gong when approaching every crossing?

"A.  We have no absolute rule on that point."

A police officer, who was a passenger on the car at the time of the accident, states that, to his knowledge, the motorneer used his best efforts to stop the car by the use of his brake; and that he distinctly sounded his gong about the middle of the block.  That it was immediately afterwards that he saw him turning his brake.

He said, there had been a shower of rain and the motorneer had on a rubber coat.

A witness, who lives in the block adjoining the one where the accident occurred, makes this statement, viz:

"I crossed Independence street.  I was looking to see if a car was crossing, when I heard the motorneer ring the bell.  The car was coming at full speed.  And when I looked toward Congress street, I saw a cart and a mule.  Then I saw the motorneer trying his best to stop the car, but he could not stop it.  At the same time I saw a man in the cart trying to pull the mule back; but he could not do it.

"Q.  At what gait was the mule going—at what speed?

"A.  Just a slow walk; but he could not pull the mule back.

"Q.  You say you saw the motorman attempting to stop the car?

"A.  Yes; he tried to stop the car, but he could not do it."

She says she distinctly heard the gong sounded.

Another witness, who was a passenger on the car, says "the motorman rang his gong at some place between the street below and the street where the accident happened.  I don't know the name of the street.  There was a kind of a drizzling rain, and the motorman had on his rubber coat, etc."  He said the motorman was trying to put on his brakes; "if he had had steam on he could not have put it on harder."

The motorman who was in charge of the car which came in collision with the cart, makes this statement, viz:

"On my three o'clock trip going up Royal street, on reaching (a point) near Congress street, there was a cart coming out Congress street, going toward the river.  There was a drizzling rain.  I rang the gong about the middle of the square in between Independence and Congress.  And when I noticed the mule's head it was about sixty feet from the corner—the mule going in the direction of the river."

That is to say, that when he first saw the appearance of the mule's

head, the car was sixty feet from the corner of Congress and Royal streets.

He said that he at once tried his brake, but the distance was so short that he tried his reverse, but it would not take effect.

He said he could not prevent the accident because the distance was so short. "It was too short a distance to stop any car."

"Q. What was the speed of the car at the time?

"A. I don't know; about ten miles an hour.

"Q. How many notches did you have on?

"A. Six notches; that is all the cars there run on—six notches is all they have."

He said his brakes were in perfect order; that he never had any trouble with the brakes on that car.

In the course of that witness' cross-examination, the following was brought out, viz:

"Q. You did all you could to stop the car before you got to Congress street?

"A. Yes, in order to avoid the collision.

"Q. Your speed, when you began to check up, you say, was about ten miles an hour?

"A. About that, I am certain.

"Q. Did your speed increase, or diminish from that point when you tried to check the speed of your car?

"A. As soon as I applied my brake, it checked the speed.

"Q. You say, you shut off the power?

"A. Yes.

"Q. Did you do that at the same time when you put on the brake?

"A. Yes; when I saw that the distance was too short to stop (the car) by the brake, I applied the reverse.

"Q. All of that would bring the car, when getting to Congress street, going at that rate of speed—you threw off your power first, and then applied the brake?

"A. Yes.

"Q. And then you reversed your power?

"A. Yes.

"Q. And that would make your car, running at what rate of speed, when getting to Congress street?

"A. About half speed.

"Q. It would run at half speed at Congress street?

FIFTY-FIRST ANNUAL REPORTS, 1899.            277

Dieck vs. N. O., City & Lake R. R. Co.

"A.   Yes.

"Q.   You could, then, by doing what you did, reduce your speed half speed within a distance of sixty feet?

"A.   Yes.

\*            \*          .\*          \*          \*          \*          \*

"Q.   You needed a hundred feet, and no less, to make the car stop?

"A.   That is if you have a dry track.

"Q.   On that day, I understand, the track was slippery as it had been raining?

"A.   Yes.

\*            \*          \*          \*          \*          \*          \*

"Q.   Mr. Dieck started right across the street?

"A.   Yes; I tried to save him, and avoid a collision.

"Q.   The man in that cart did not change his course?

"A.   How was that?

"Q.   He kept straight across Royal street?

"A.   Yes; he kept straight across Royal street.

"Q.   Do you know whether or not he saw the car?

"A.   I don't know whether he saw the car or not.

"Q.   He kept right straight on across Royal street?

"A.   Yes."

The statement of the conductor of the car, in every essential detail, corroborates that of the motorneer.

With this witness' evidence the case was closed, without any testimony in rebuttal, or any attempt being made on the part of the plaintiff to impeach the defendant's witnesses, or to impair the effect of their testimony; for the testimony of the plaintiff, as well as that of the defendant, puts the fault or blame, if any there was, upon the plaintiff, and altogether exonerates the defendant.

On account of the serious character of the injury inflicted on the plaintiff, the large amount of damages claimed, the weight which ought to attach to the verdict of a jury, and the fact that the district judge declined to grant a new trial, have impressed us with the onerous duty of instituting a more than usually careful examination of this record; and we are fully convinced that the plaintiff has utterly failed to make out even a case of probable fault on the part of the company.

Simplified, the case may be thus stated, viz:

The plaintiff, accompanied by a little boy, was driving his two-wheeled cart along Congress street, one afternoon, at about the hour of four o'clock, in the month of April—his wagon being empty, and he occupying a standing position while engaged in driving.

His little cart was·drawn by a mule, and he was moving along at a, leisurely pace—his business seeming to have been in no wise urgent.

As he neared the intersection of Congress and Royal streets, two·workmen standing near the banquette, and only a few feet from the plaintiff's cart as he, was slowly passing by, called to him, or rather· halloaed to him, to stop, and at the same time attracting his attention to the car which was rapidly approaching on Royal street, in easy open view; but he appeared neither to have heard them, nor to have seen the car, and did not slacken the pace of his mule, which was· headed in the direction of the opposite side of the street car track and of Royal street.

At the time, his face was averted and the rim of his hat turned' down.

A rapidly approaching car was about sixty feet away, when the plaintiff and his cart came in view of the motorman, who sounded his· gong, put on his brakes, reversed his lever, and did *all that could have been done* to arrest the speed of the car; but all to no purpose, for a collision was unavoidable—the tracks being wet from recent showers· of rain.

An analysis of the evidence demonstrates two propositions, both; of which are fatal to the plaintiff's claim, (1) that, when slowly approaching the defendant's track at the crossing of the street on which· defendant's track is laid, the plaintiff neither looked nor listened for an approaching car, or if he either looked or listened, and either saw or heard the approaching car, he failed to stop his cart and thus· caused a collision therewith; (2) that the motorman used every possible effort to avoid a collision, by sounding his gong, putting down his brakes, and shutting off the electric current, just as soon as the plaintiff's mule and cart came within the line of his vision at the crossing of the intersecting street—his car being difficult to control on account of the track being wet and slippery from recent rains.

We find full confirmation of the latter in the plaintiff's version of' the accident, namely:

"When (I) first saw the approaching car (I) was at the foot of' Congress street, on the woods' side—the front foot of the mule being·

over the rail—and it was then that (I) changed the direction in which I was going." The plaintiff's contributory negligence is thus plainly exhibited, and right of recovery defeated.

The authorities are numerous and uniform to the effect, that persons whose business or pleasure occasions them to use the streets of a city which are occupied by steam-trains, are guilty of negligence if they fail to employ proper precautions for their own safety; and particularly if they fail to look and listen, at street-crossings, for the approach of trains—whether they be pedestrians or driving vehicles.

Schexnaydre vs. Railroad Company, 46th Ann. 248;

White vs. Railroad Company, 42nd Ann. 990;

Herlisch vs. Railroad Company, 44th Ann. 280.

This rule of jurisprudence was well stated in the White case, the evidence disclosing that Mrs. White was driving in a buggy with three young children, on a street in the city of Shreveport; and approached a street-crossing of the defendant's track so closely, that a passing train frightened her horse so that he ran away and injured them.

The court said:

"We are bound to hold, that Mrs. White did not exercise that degree of care and caution which the law requires of persons approaching the crossing of a railroad track with intention to cross. She was unquestionably bound to look and listen, and to exercise care and caution to avoid possible danger, suggested by the very fact of crossing."

The foregoing rule was recently applied to electric cars in the city of New Orleans, in two conspicuous cases, that of Hoelzel vs. Railroad Company, 49th Ann. 302, and Hemingway vs. New Orleans City and Lake Railroad Co., 50th An., recently decided. In the former case the plaintiff was a pedestrian, who was walking on a path parallel with the street electric car track, at 10 o'clock on a very dark night, and the car rapidly approached him from the rear, and ran over and killed him, as he was attempting to cross the track, the head-light being very dim. In the latter case, the plaintiff attempted to drive his cart, in which his two little boys were seated, over the street car track in front of a rapidly approaching car, which was in easy open view, at the hour of 3 o'clock p. m., and was thus brought into collision therewith, whereby he and his boys received serious injuries.

In the Hoelzel case we referred to the rule, "that one approaching a railway crossing, or attempting to cross a railroad track, must carefully look up and down the track," and observed that the court was

called upon to determine whether it applied to an electric car or a street railway, and said:

"Greater prudence is required of a pedestrian who crosses a railway track of a steam or electric car of a city."

In Perez vs. Railroad Company, 47th A. 1391, this court held it to have been negligence on the part of a driver of a tallyho to attempt to cross a street crossing, in front of a rapidly approaching train at 11 o'clock at night, and said:

"It was the duty of the driver to have looked and listened before attempting to cross the railroad track. And notwithstanding that he did look and did plainly see the approaching train—the night being clear and the headlight of the locomotive being distinctly visible—the driver *rashly* undertook to drive his tally-ho across the track immediately in front of it, and scarcely a block away, and moving at a confessedly rapid rate of speed."

In Smith vs. Crescent City Railroad, 47th Ann. 833, we held that one who, in the night time, walks upon the track of a street car, is bound to use his senses to avoid contact with the car; and if by the exercise of ordinary care he would have been apprised of the advancing car in ample time to have left the track and failed to do so, was guilty of negligence and could not recover damages in case of accident.

In Schulte vs. New Orleans City and Lake Railroad Co., 44th Ann. 509, this court, speaking through Chief Justice Bermudez, said:

"The authorities are numerous, that, on approaching a street-crossing of a railway track it is the duty of a traveller to exercise his senses of sight and hearing, and to look and listen for the approaching train, or car; and that his failure to do so is negligence, which, in case of collision, prevents the recovery of damages for injuries sustained"—citing them, and applying same to that case.

In our opinion the facts disclosed by the record bring this case within the rule established in the cited cases, and a like judgment should be rendered rejecting the plaintiff's demand.

It is therefore ordered and decreed, that the verdict and judgment appealed from be annulled and reversed; and it is further ordered and decreed, that the demands of the plaintiff be rejected at his cost in both courts.