(35 South. 251.)

No. 14,465.

## HEEBE v. NEW ORLEANS & C. RAILROAD, LIGHT & POWER CO.*

(June 22, 1903.)

STREET RAILROADS—ACCIDENT AT CROSSING—CONTRIBUTORY NEGLIGENCE.

1. The recognized rule is that before attempting to cross a railway track a person should stop, look, and listen, and it will hardly do to substitute for it a rule to the effect that, being at a distance from a crossing, towards which he and an electric or steam car are traveling, he may then form an opinion as to which of the two will get there first, and, acting upon that opinion, essay the crossing without giving himself further concern upon the subject.

2. The fact that a street railway company has operated a car at too high a rate of speed will not entitle a party who is injured to recover if it appears that the fault of the company would not have caused the injury save for the supervening and greater fault of the party injured.

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; Thomas C. W. Ellis, Judge.

---

*Rehearing denied November 16, 1903.

Action by Bernard Heebe against the New Orleans & Carrollton Railroad, Light & Power Company. Judgment for plaintiff, and defendant appeals. Reversed.

Dart & Kernan, for appellant. James Wilkinson, Arthur John Peters, and E. Howard McCaleb, for appellee.

### Statement of the Case.

MONROE, J. This is an action in damages for personal injury sustained by plaintiff, who, whilst driving across defendant's railway tracks on St. Charles avenue at the intersection of Marengo street was run into by one of defendant's cars, with the result that his wagon was overturned, and one of his legs was so badly crushed as to necessitate amputation. He alleges that he approached the crossing slowly and carefully, and looked and listened, and that he saw no car nearer than Napoleon avenue; that the accident was in no way the result of any fault or negligence on his part, but was caused entirely by the gross negligence of the defendant's employés; that the motoneer of the colliding car could and should have seen his horse and wagon in time to have stopped his car, but that he was either not attending to his duties, or else, by reason of the reckless and dangerous speed at which the car was going, he delayed attempting to stop until it was too late; and that he gave no warning of his approach.

The defendant denies the negligence imputed to it, and alleges that the accident was caused entirely by plaintiff's negligence, or at least by his contributory negligence. The case was tried in the district court before a jury, nine of whom found a verdict for the plaintiff in the sum of $2,500, which was made the judgment of the court. The defendant has appealed, and the plaintiff has answered, asking that the amount allowed be increased to $25,000, as prayed for in the petition.

We find from the record that:

The plaintiff is a baker, who lives and conducts his business on Carondelet street, near Marengo, and has done so for 30 years; Carondelet street being the next street upon the woods side of, and parallel to, St. Charles avenue, and St. Charles avenue having two roadways, with a strip of ground between, upon which the defendant operates a double-track electric railway. The plaintiff has customers upon the river side of the avenue, and in delivering bread to them, and for other reasons, has been in the habit of crossing the defendant's railway tracks at the intersection of Marengo street at least six times a day. Upon the morning of the accident he started out, as usual, at 4 o'clock, and, having delivered his bread, and being on his way home, he entered the roadway on the river side of St. Charles avenue, through Milan street, which is the next street above and parallel to Marengo. He was seated inside of a covered, four-wheel wagon, from which he could not see upon either side unless he leaned forward for that purpose, and he was driving a fast mule. He states that when he entered the avenue he looked up and down, and saw no car in either direction, and that he drove at a trot down the river side roadway in the direction of Marengo street (325 feet distant), with the intention of crossing the railway at that point. He further states that when about 8 yards from the crossing he looked out for cars, and saw one standing at Napoleon avenue, which avenue crosses St. Charles two blocks above Milan street, and three blocks, or, say, 1,000 feet, above Marengo; that, seeing no other car, he drove on, without stopping, looking, or listening, and, making a wide turn, was crossing the track nearest to him at a fast walk, and had almost crossed, when the left hind wheel of his wagon was struck by a downcoming car with such force that he was thrown about 9 feet in the air, and the wagon and mule were thrown to the other (woods) side of the railway, into the street, the result, so far as he was concerned, being that his leg was badly broken, and was subsequently amputated, a few inches above the ankle.

The plaintiff adheres throughout his testimony to the theory that the colliding car was the car which, while driving at a trot towards, and when within eight yards of, Marengo street, he had but a few seconds before seen standing at Napoleon avenue. He admits that after the occasion mentioned (when he was eight yards from the crossing) he did not again look for a car until the moment of the collision, and that it was then

too late for him to get out of the way, although, as the car struck only the tire on the rear of the left hind wheel of the wagon, it is evident that but little acceleration of the speed of the mule would have been required for that purpose. As a matter of fact, the plaintiff was not thrown nine feet in the air, nor was the wagon thrown with the violence described by him. He was on the lower section of the crossing, and the head of the mule was a little farther downtown than the tail of the wagon, so that when the wheel was struck from behind by the car (although the speed of the latter had been so much reduced that it was stopped on the foot crossing but a few feet farther on) it (the wagon) was lifted some inches, possibly a foot, and a forward movement was given to it, and either that or the movement (involuntary, perhaps) of the mule brought it in contact with an. iron post or wheel guard which stands in the ground at the lower (woods) side of the crossing, and both wagon and mule were overturned, and the plaintiff was taken from beneath the wagon. There were seven persons near by, who profess to have seen the accident, and to know something of the situation of the parties just before it occurred.

Devere, a machinist, sworn for the plaintiff, was approaching the scene from the woods side, on the lower side of Marengo street, and he testifies that when the accident occurred he was all of 175 feet away, near a certain gate, walking rapidly towards the avenue. He also testifies that when the plaintiff turned to make the crossing, at which time he must have been more than 175 feet away, there was no car in sight as far as Milan street, but that when the plaintiff was crossing, and was nearly across, the track, he (the witness) saw the car which inflicted the injury coming at very high speed, and that the thought struck him, "Will he escape?" At one time he seems to place the car when he first saw it, and when Heebe was crossing the track, just below Milan street, and at another time he seems to place it at a distance of only 75 feet from Marengo street, and he says that the gong sounded twice, and then, as the collision occurred, a third time. It otherwise appears that from the point on Marengo street from which the witness states that he witnessed the accident he could not have seen up the railway on St. Charles avenue as far as Milan street, and, as he was walking rapidly towards the avenue, and must therefore have been still farther back before the accident occurred, it follows that when the plaintiff turned to make the crossing he was not in a position to know just how far below Milan street the car was.

Paul Croon, a colored man, sworn for the plaintiff, testifies that he crossed the track, going in the direction of the river, and that he met the plaintiff driving on the track just as he (witness) had crossed; that as he crossed he saw the car near the drug store, on the lower corner of Milan street, and that he had just reached the banquette on the river side of St. Charles avenue when the collision occurred. He also undertakes to say where the car struck the wagon and where the plaintiff fell, and he states that the mule was trotting across the track, and that, after striking the wagon, the car ran half way to the next street below before it was stopped. We make the following excerpts from the testimony of this witness:

"Q. As you were going from the woods side track, you looked up the street? A. Yes, sir. Q. You saw this car coming, plainly? A. Yes, sir; I saw it coming down. Q. Below the drug store? A. This side of the drug store somewhere. Q. The drug store is on the corner of Milan street? A. Yes, sir; Milan. Q. You were on the corner of Marengo street? A. Yes, sir. Q. That is one square below Milan? A. Yes, sir. Q. There was nothing to prevent you from seeing the car? A. I saw the car this side of Milan. Q. You saw it plainly? A. Yes, sir. Q. You saw it was coming fast? A. Yes, sir. Q. You heard the noise it was making? A. I just see the car coming. Q. You said you heard the noise of the car? A. Yes, sir; but no bell at all. Q. Just at that moment, when you looked up, you saw Heebe coming? A. He was just coming across. Q. He was not on the track? A. Just as I see the car first he passed me, the car passed him, the car got to him so quick, I don't know how he got there. Q. The car reached the track before you could cross? A. Just did pass it, and got out of the way. Q. You looked up the street, saw the car coming, and at that very minute you saw Heebe

coming across? A. Yes, sir. Q. And before you could walk over one track, was it there? A. Yes, sir. Q. Before you could well cross one track, the wagon was struck by the car? A. Yes, sir; before I could get to that window the wagon was struck by the car. (Note. Counsel for plaintiff paces off his steps, and says it is five of his strides, say, twelve feet.) Q. You looked up when you were crossing that track—the woods side or the river side? A. The river side track, I was crossing, and the car was coming down the river side track. * * * Q. You did not look up to see the car until you crossed the river side track? A. Just as I crossed it. Q. Well, had you gotten off the track when you looked up? A. I just had gotten off. Q. And when you looked up that time, you saw the car coming? A. Yes, sir. Q. Where was Mr. Heebe's horse's head when you stepped off the track? A. He hadn't got his hind wheels—he just was crossing the time I looked up and stepped over. I heard the car strike the wagon, 'Bim'! * * * Q. You walked how many steps of yours when you heard the crash? A. I just stepped to the banquette. I hadn't got as far as from here to the door. Mr. Heebe hadn't got across. Q. You hadn't gone twelve feet away from the track when you heard the crash? A. No, sir. * * * Q. Isn't it true that you hadn't reached the street? A. I had just left the track, going across to the banquette. I hadn't gotten there. Q. You had not reached the middle of the street yet? A. No, sir."

Of course, if, as the witness says, he first saw the car as he was crossing the woods side track, he did not first see it just after he stepped off the river side track; and if he first saw it after he had stepped off the river side track, and it was then near Milan street, 325 feet away, he did not just pass it and get out of the way; and if he had only reached the middle of the street when he heard the crash, he could not have reached the banquette on the other side; and if he was walking away, with his back to the scene, he could not have witnessed what transpired, etc. If there is anything at all to be derived from the testimony of this witness, it is that Heebe drove his wagon on the track in dangerous proximity to the approaching car.

Priscilla Sanders, a colored woman, sworn

for the plaintiff, was occupying the rear seat on the river side in the car in question, and was engaged in looking out of the window until just as the car passed the drug store on the corner of Milan street, when she happened to turn her eyes to the front, and saw the plaintiff's wagon crossing at Marengo street. She says that the mule and the front of the wagon had already crossed at that time, and that only the back part of the wagon was on the track. She also states that she saw a movement of the reins, though she could not see the driver of the wagon, and that the motorman, about the middle of the square, applied his brake, but that, nevertheless, before the tail of the wagon cleared the track, it was overtaken by the car, which, however, stopped immediately afterwards. It is only necessary to add that no speed that is attributed to the car could have enabled it to strike the wagon under the circumstances described by this witness.

Deneger, a machinist, sworn for the defendant, was standing upon the upper (woods) side of the crossing at Marengo street, waiting for an uptown car. He testifies that when the colliding car was within 100 feet of the crossing the plaintiff was still on the roadway, about eight yards from the corner; that when the plaintiff started to cross the track the car was about a quarter of a block away; that the motorman cut off the power and applied his brake, and that the car was stopped almost instantly after striking the wagon.

Tournabene, the motorman of the car in question, testifies that he saw the wagon on the roadway about 10 feet from the corner when he was about 150 feet from that point; that he rang his bell, and that the wagon went on down the street until he was within about 50 feet of the crossing, when it turned "around and shot right ahead of the car"; that he did his best to stop the car before striking the wagon, and was unable to do so, but that it was stopped on the lower foot crossing. He also states that he had been using all the power provided and going at full speed, and that, after shutting off the power and putting on the brakes, he further attempted to stop the car by reversing the power, and that he burned out a fuse.

Rosché, the conductor, testifies that his attention was first attracted by the gong and by the efforts of the motorman to stop the car, and that the plaintiff's mule was then going on the track 40 feet in front of the car.

Parker, a motorman, who had just come off night duty, and was going home as a passenger in the car in question, testifies that his attention was attracted by the gong; that the car was then about 75 feet from the corner, and that the wagon gave some indication of crossing the track; that "you couldn't tell," however, whether it was the purpose of the driver to cross or not, but that when the car came nearer he shot right across; that the motorman had kept ringing his bell and trying to stop the car, but was unable, under the circumstances, to avoid the collision.

A number of witnesses were interrogated as to the speed of the car, and our conclusion is that it was not under, but, if anything, exceeded, 15 miles an hour. Other witnesses were interrogated as to the distance within which a car can be stopped, and from the preponderance of the testimony it appears that a motorman who stops a car, such as the one in question—over 30 feet long, weighing 14,000 pounds, and traveling at the rate of 12 miles an hour—within from 100 to 120 feet, does uncommonly well. One of the witnesses sworn on behalf of the plaintiff, and professing to be an expert, testifies that a car of that description, equipped with sand boxes, can be stopped within 15 or 17 feet. And one of the defendant's witnesses gave some such testimony, but subsequently admitted that he was in error.

### Opinion.

Counsel for the plaintiff concede that, if the plaintiff was within 8 yards of Marengo street when he saw a car standing at the corner of Napoleon avenue, and continued, as he unquestionably did, on his course, the car that he saw could not have traveled, say 1,000 feet, and have collided with his wagon before the wagon cleared the track at the Marengo street crossing; and they propound the theory that another car intervened between the plaintiff and the car that he saw at Napoleon avenue, the proposition being thus stated in their brief: "We think the real truth in this case is that Heebe did look out the first time, and saw no car in sight; that he did look out the second time, and saw and heard no car save the one he saw at Napoleon avenue, but that the car that did the damage to him was, when he looked out the second time, then approaching at full speed, above the corner of Milan street, hidden by a clump of china ball trees in full bloom, in June, just below the corner of Milan street, on the river side."

We have not, in the preceding statement of the case referred to the trees thus mentioned, because the evidence entirely fails to show that they could have prevented, or did prevent, the plaintiff from seeing any approaching car, he (himself) testifying that the foliage upon a few trees mentioned by him was seven or eight feet above the ground, and not intimating that it had that effect, but insisting that the car which collided with his wagon was the one which he saw standing at Napoleon avenue; and because it does not at all appear that the defendant was responsible for the position of the trees, or for any effect that they may have had in obstructing the plaintiff's view of the railway; and again, because, even if the defendant were so responsible, and the foliage had been so dense, all the way from Marengo street to Napoleon avenue, as to have concealed any car that might have been coming down, it would have afforded the plaintiff no justification for driving on the railway without using some precautions to find out whether he could do so in safety. On the contrary, such a condition of affairs would have made it all the more necessary for him to have stopped, or at least to have looked, immediately before attempting to cross at Marengo street, since he would not otherwise have been able to inform himself of the danger which might threaten such an attempt. The truth, as we conceive it to be, from our reading of the testimony, probably is that the plaintiff was mistaken in saying that he was within eight yards of the Marengo street crossing when he saw the car standing at Napoleon avenue. He was asked, while on the stand, the length of his mule and wagon, and he was unable even to approximate it, though they are objects with which he is necessarily very familiar. What reason, then, is there for supposing

that he could, at some subsequent time, approximate the distance between him and the corner when he looked out of his wagon, on the morning of the 19th of June, to see whether a car was coming? His statement of the distance was at most a mere guess; and as we think, with him, that it was the car that he saw at Napoleon avenue that collided with his wagon the guess was wide of the mark, for, assuming that the car came down at the rate of 20 miles an hour, and that plaintiff was traveling no faster than 2 miles an hour, he must needs have crossed the track in safety, since he had considerably less than one-tenth as far to go as the car. The plaintiff was, however, traveling at a better speed than two miles an hour, for he says that his mule was fast, and that he trotted on the roadway and walked fast when he started to cross the track, and, as the mule and his master were returning home at a time and under circumstances which justify the belief that the morning meal was awaiting them, it is not likely that he is mistaken.

If our conclusion as to the car that did the damage be correct, and the plaintiff made his reconnaisance at a point farther up the avenue than he has stated, it seems most probable that the deplorable misfortune which befell him resulted from his · relying upon his judgment as to the speed at which the car would travel as compared with that of his mule, and from his driving upon the railway without again looking to see whether his judgment was correct. The rule that has been laid down in cases such as this is that the individual must stop, look, and listen before attempting to cross a railway, and it will hardly do to substitute for it a rule to the effect that, being at a distance from a crossing towards which he and an electric or steam car are traveling, he may then form an opinion as to which of the two will get there first, and, acting upon that opinion, essay the crossing without giving himself further concern upon the subject. If the car in this instance was traveling at no higher speed than 15 miles an hour, the defendant was not at fault, for, although a railway company may not always run its cars at the maximum rate allowed by law, regardless of the particular conditions existing at the moment, there were no particular conditions existing on St. Charles avenue, at a quarter to 6 o'clock on the morning of the 19th of June, 1901, which rendered it improper or unsafe to operate a car at that speed. It is likely, however, that the car in question was running at a higher rate of speed than 15 miles an hour, and, in so far as the speed exceeded that rate, the defendant was at fault, since that is the maximum rate allowed by the ordinances of the city at that point. But the fault of the defendant would not have caused the accident save for the supervening, and greater, fault of the plaintiff, who, as he came down the street, having guessed at the probable speed at which the car that he saw, and which he knew would soon be in motion, would come down, as compared with the speed of his mule, sat inside of his wagon, where he could see upon neither side, and, as it appears, heard nothing, and drove into a position where a collision was to have been expected if his guess proved to be wrong, and where, as it turned out, a collision was inevitable. If the defendant had stopped and looked and listened before driving in his hooded wagon upon the railway track, he could and would have seen the car coming at high speed, and he might have governed himself accordingly, or if he had looked or listened, even after he had started across, the accident might readily have been averted; since, as the car struck only the tire upon the back of the left hind wheel of the wagon, it is evident that the slightest acceleration in the movement of the mule would have carried the entire wagon beyond the danger; but, neither looking nor listening, the plaintiff drove in front of the too rapidly moving car within a distance so short that the motorman, without his cooperation, was unable to save the situation.

An effort was made during the trial to show that sand boxes are necessary to the proper equipment of a street car, and that, if the car in question had been so provided, it could have been stopped within a shorter time and distance. The petition, however, charges negligence only in the matter of running too fast, and makes no attack upon the defendant's equipment, and the evidence, as offered, was properly excluded. Moreover, the witness relied on to establish the proposition stated is he who testified that a car over 30 feet long, weighing over 14,000·

pounds, and traveling at the rate of 12 miles an hour, can be stopped within a minimum distance of 15 feet, or in less than one second of time, and we think that the credibility of his testimony is open to question, the more particularly as it appears that it took him, an avowed expert, 3½ seconds merely to go through the motions necessary to apply the stopping power. The plaintiff appears from the evidence to be a worthy citizen, and the misfortune he has sustained is greatly to be deplored; but,' whilst the defendant is, perhaps, not wholly free from blame, that misfortune is mainly attributable to the plaintiff's own imprudence, and its consequences cannot justly be visited upon another.

It is therefore ordered, adjudged, and decreed that the verdict and judgment appealed from be annulled, avoided, and reversed, and that there now be judgment in favor of the defendant, rejecting the demand of the plaintiff at his cost in both courts.