WM. MAXWELL

 VS No. 8595

N. O. RY. & LT. CO. & al.

June 5th, 1922.

Court of Appeal
PARISH OF ORLEANS
FILED June 5/22
A. Stansbury

CHARLES F. CLAIBORNE, JUDGE.

This is a damage suit arising from an automobile accident.

The plaintiff alleges that on February 8th, 1919 at about 12:30 of the day, he was seated on the top of a pile of lumber upon a trailer attached to a motor-truck owned and operated by his employer John B. Mertzweiler; that while the said Mertzweiler was in the act of crossing Magazine Street, at the intersection of Foucher Street, from the lake side of Magazine Street, going in the direction of the Mississippi River, and while the said truck was turning into Magazine Street, in the direction of downtown, and the said trailer was on the lake side railroad track, a car of the Magazine Street line of defendant company running uptown dashed into the left hand hind wheel of said trailer with such force that the trailer was knocked from said track causing your petitioner to be thrown from the trailer down to the ground on Magazine Street; that he received serious injury for which he claims $15,700 damages.

The defendant company pleaded a general denial and specially averred:

"that at the time and place and at the hour named the said car was being prudently operated on Magazine Street on a trip uptown, when the automobile with a trailer attached which was being driven on Foucher Street towards the River attempted to cross the track when a car was practically at the crossing, so that there was neither time or distance within which to stop the car or so

check it that the accident could be avoided".

There was judgment in favor of defendants, rejecting plaintiff's demand, and he has appealed.

Concerning the manner in which the accident happened, there were three witnesses for the plaintiff, viz: Mertzweiler, Devensky, and the plaintiff Maxwell.

1o Mertzweiler testified practically that he was driving the automobile to which was attached the trailer; that there was a very light load of six or eight planks each eleven feet long upon the trailer, and that Maxwell was sitting on the planks; that the length of the whole outfit, auto and trailer, was 27 feet, 10 inches; that the width of Magazine Street from curb to curb is 38 feet; that he was driving out Foucher Street to the river; that when he reached Magazine Street, he checked up almost to a stop; that he looked up and down Magazine Street; that he saw a car coming down the street; and another going up the street, both about a block and a half away; that he proceeded to cross the street, when the uptown Magazine car hit the left hind wheel of the trailer and broke it, throwing Maxwell to the ground; that there was no obstruction to the car seeing him, as the fence on the downtown wood corner of Foucher and Magazine was a low iron fence; he went over this crossing at the rate of about 4 or 5 miles; after hitting the trailer, the car ran ten or twelve feet before it stopped; the left hind wheel was on the river side rail of the uptown track when it was struck; if he had seen a car approaching he could have stopped immediately within two feet; he had often gone over that crossing; there is a double track on Magazine Street; there is a roadway on each side of the two tracks; he heard the motorman say:

"I put on my brakes and they wouldn't hold"; when the car got near him it

"hurried its speed".

2o P. A. Devensky testified that he was a passenger on

the Magazine car and occupied a seat next to the window on the
left hand side of the car two sea s from the front; he was reading the paper; the car

"ran pretty fast, then s ed down,"
he looked through the window aw an automobile crossing
slowly about fifty feet distant; he felt a jolt and then saw the
car had struck the trailer, and saw the man going overboard with
his head down; he had known Maxwell for about a year; witness
was a dry goods peddler and had sold goods to Maxwell; did not
hear the motorman sound his gong; after the car struck the wagon
it stopped almost at the same time; he though Maxwell had been
killed; a few days later he went on his route peddling and stopped at his house as he

"thought, may be, they might want black goods".

3o William Maxwell, the plaintiff, says he was seated
on the lumber on the trailer near the front, facing uptown, to
see if the uptown car was coming. Merzweiler was seated on the
left side of the auto, driving; he said:

"we started from the house with a load of lumber, on
Camp Street, coming out Foucher to Magazine to take the
downtown track as far as Washington, then turn out Washington towards the river, with the work at Washington and
Constance. And just as we got to Magazine we kind of
halted a little to see our way clear of the car, because
we pitch across and he looked down and I looked up and
saw everything was clear and he holloaed to me how it was.
I told him all right. He answered me back the same and
we went on. Just about the time that we were crossing the
track, the trailer was, there come the blow down, and I
want; that's all I know";

he did not hear the Magazine car coming;

"he could see far enough to know if a car was coming";

maybe half a block; he did not look down at all; he could see over the fence seated high up on the trailer, heard no gong.

There was offered in evidence a photograph representing the place of the accident, its approaches, and surroundings.

Eight witnesses testified for the defense.

1o M. Ferrage; at the time of the accident was watchman on the river front, and is now carrier for the States; he was standing on the left hand side of the platform of the car coming down Magazine Street towards Canal; he looked ahead and saw the automobile at about 15 or 20 feet from the corner; it seemed as if it had slacked up to let the car go by, and afterwards it put on more speed and came right around; at that time the car must have been 40 feet away from Foucher Street; the car was coming about half speed; when it neared the corner it put on full speed, and when he noticed the auto coming, he threw it off but did not have time; both cars sounded their gong;

> "a child was playing in the middle of the square with the car coming from Canal Street and the motorman kept ringing the gong to get the child off".

2o W. Rossbach was a florist on the date of the accident, but is now employed by the defendant Company; on the date of the accident he was working in the garden of the residence corner of Foucher and Magazine; Frank Ritter was working with him at the time;

> "Mr. Mertzweiler came with the automobile from around Camp and Foucher. He lives on Camp. He came around the corner so fast I had to holloa at my man to get out of the way. He just did get out of the way in time, or he would have run over him x x After he saw the car coming he tried to put more speed on it to make the curve to go below. He made it, but the back of the wagon hit the wheel right where the tender is, hit the wheel and broke the back wheel";

the car was then pretty near Foucher Street; just after the car hit the wagon, the car stopped dead.

3o Frank Ritter says:

"The man liked to run over me with his automobile. I was loading trash on Mr. Rossbach's wagon and he hollaed to look out for the machine. I had to get up between the two wheels of the wagon to keep him from htting me. He went to make a long turn and the car hit him".

The balance of his testimony is practically a repetition of Rossbach's.

4o C. Curley was the motorman on the occasion of the accident on the car going towards Canal Street. He is 39 years old, and has been 13 years in defendant's employ as such; he had a hard time stopping himself; he stopped his car on Foucher Street; he saw the auto coming at a fast rate of speed, so he jammed on the emergency brake and pulled the reverse; the plaintiff fell in the middle of his track; he stopped his car about two feet from his head lying in the middle of the track.

Q. "Then this man tried to cut between two cars, both of which were close to the crossing, you say?

A. Yes, sir."

Continuing the witness says: The auto must have been going 12 or 15 miles; with a good brake and a dry track he can stop a car going 15 miles an hour in a distance of 100 to 125 feet; there was one man on the platform of his car.

5o John Shaw was motorman on the Magazine car going up, that did the damage. He says: He madd a stop at Aline Street, one block below Foucher; as he started up he was speeding the car up, and when he got about 100 feet from the corner of Foucher he noticed the auto pop up from the feather edge fence; he hit his gong, but it was too close, the front end of his car caught the back wheel of the trailer; when he saw the auto coming, he

hit his gong, threw the power off, had the air on, and threw his reverse; his brakes were in good condition; he could not have stopped his car sooner than he did.

6o R. C. Puig was conductor of the car involved in the accident; his attention was attracted when the motorman pulled his reverse; the car was then about a car length from the corner, 45 or 50 feet; he heard the gong; then he heard the crash; the downtown car also stopped there.

7o Jos. A. Morgan, was employed by the defendant Company at the time of the accident, not now; he was occupying the front seat left hand side against the window of the car going downtown; he saw an auto coming out of Foucher Street, going pretty fast about 20 miles; the car going up was then about 45 feet from the crossing; both stopped at the same time along the side of the trailer; they were going at a speed of about 20 miles an hour.

8o Joseph B. David is employed by the Service Printery; was never in the service of the defendant; on the day of the accident he was in the car going downtown, and saw part of the accident; the auto was moving pretty fast; it did not go straight across Magazine Street; if it had, it would have missed the car; it went diagonally across; his car stopped within one foot of plaintiff's head; he was seated on the right hand side of the car on the front cross seat next to the "admiration" seat; the motorman of the upbound car

"tried his mightiest to stop the car";

he had a clear vision of the auto; it was crossing when he first saw it - it stopped about two car lengths after the accident.

Assuming that all the witnesses are equally credible, we find that the testimony overwhelmingly established that Mertzweiler failed to exercise his faculties of vision and did not see the car coming up the street because he failed to look. 140 La. 21. The time was midday and the weather clear, and if he had looked he would have seen the car. We must assumed therefore that he did

see it, and that he took his chances to pass ahead of the car with impunity; if he did not see it, he was negligent; the law favors the vigilant. 9 Ct. App. 86: 50 A. 1087; 106 La. 236; 51 A. 299.

But Mertzweiler is certainly mistaken when he says that the cars were a block and a half or 450 feet away when he arrived at Magazine Street. He is contradicted by several witnesses and by stern facts. When he reached that street he had about 30 feet to get into the middle of the street, and his auto and trailer together measured about 30 feet, so that he had to travel at best 60 feet to clear the track on the wood side; he traveled at the rate of four miles an hour. If we assume that the car's speed was 16 miles an hour, then the car travelled four times as fast as the auto; therefore while the auto travelled 60 feet the car went only 240 feet, which would bring it only within 210 feet of the auto. But the most reliable testimony is that the car was speeding at the rate of only eight miles an hour, which would corroborate the testimony of other witnesses that when the auto reached the corner the car was about 100 feet away. If this be true then two conclusions shield the motorman from blame. The first is that he could not stop his car in that short distance, and the next is that he had a right to assume, when he saw the auto, that the chauffeur would check his machine so as to allow him to pass. Such were the rulings in the following cases: 8 Ct. App. 340.

In Cowden vs Shreveport Belt Ry. Co. 106 La. 236 the Court said on p 240:

"And even after the horses had fairly emerged from behind the corner building, say when their heads had reached the sidewalk line, he (the motormeer) was not bound to divine the intention of the wagon to make straight for the track, and, so divining, have recourse at once to heroic measures for stopping the car; the natural assumption in suchcase

was that the wagon would stop or turn aside. If a motorneer must, under penalty of negligence, or worse, assume that every vehicle or every pedestrian he sees moving towards the track will keep on the even tenor of their way, and acting upon such assumption, must at once put on brake and reverse current, what becomes of rapid transit in Cities?"

In the case of Marsten vs Shreveport Traction Co. 140 La. 21, the Court repeated:

"The motorman had the right to assume that the plaintiff. who was driving slowly, would stop or turn his machine before reaching the car tracks. Plaintiff's intention to cross could not have manifested itself to an observer until he was within a few feet of the rails".

See also 48 A. 12; 52 A. 422; 137 La. 832.

In the case of McShane vs N. O. Ry. & Lt. Co. 137 La. 830 the Court said:

"We affirm the doctrine heretofore announced in two very similar cases 106 La. 236 and 110 La. 970, that to attempt to drive a vehicle across street railway tracks in front of an approaching car, which could and should have been seen with ordinary care and prudence, is such negligence as must prevent the recovery of damages for injuries resulting from a collision with the car". Affirmed in Marston vs Shreveport Traction Co. 140 La. 21.

It is also the law that street cars in Cities have the right of way. In the case of Walker vs Rodrigues 139 La. 251 (253) the Court said:

"Besides, the train had the right of way, and it was the duty of the defendants to have guided and controlled their cars , and to have yielded this right of way, without running over the neutral ground, and injuring plaintiff in so doing".

The negligence of Mertzweiler is made the more evident by his own testimony in which he states he could have stopped his automobile

"within two feet". 140 La. 20.

The testimony of the plaintiff cannot help him as he testifies that he was looking uptown and was turning his back to the car coming uptown that did the damage.

We therefore come to the conclusion that the accident was caused by the negligence of the chauffeur of the automobile and not by any fault of the motorneer of the car, and under settled jurisprudence the plaintiff cannot recover. He is bound by the negligence of the chauffeur. 106 La. 236: 132 La. 773; 140 La. 18.

Judgment affirmed.
June 5th, 1922.