HON. LYNN B. WATKINS,
HON. SAMUEL D. McENERY,
HON. JOSEPH A. BREAUX,
HON. HENRY C. MILLER.
} *Associate Justices.*

### No. 11,813.

#### JOHN SNIDER VS. NEW ORLEANS & CARROLLTON RAILROAD COMPANY.

In a suit for damages for personal injuries received from a collision with the car of an electric car company, proof that the company may have failed in its duty in the employment of a particular motorman, or in furnishing to a particular car its proper equipment, is not sufficient for a plaintiff to recover. The proof must show that the accident was caused by reason of these particular breaches of duty. 42 An. 1153; 44 An. 694.

It is a recognized rule that before attempting to cross the track of an electric car a person should look to ascertain whether prudently the crossing should be attempted. The rule contemplates that this should be done at a time and place when the reason upon which it is founded could be made effective. When the law requires steps of diligence and caution it will not be satisfied by the substitution therefor of vain and useless acts.

A PPEAL from the Civil District Court for the Parish of Orleans. Monroe, J.

*George L. Bright* for Plaintiff, Appellant.

*John M. Bonner* for Defendant, Appellee.

Argued and submitted May 23, 1895.
Opinion handed down November 18, 1895.
Rehearing refused January 6, 1896.

Plaintiff demands a judgment for fifty thousand dollars damages, for an injury received by the wheels of one of the cars belonging to and operated by the defendants running over and crushing his foot, thereby necessitating the amputation of his leg.

The plaintiff had been for many years a plumber and gas fitter in the city of New Orleans. The defendants were engaged in running a line of street cars, propelled by electricity from Canal street, on Baronne street and St. Charles avenue, to a point in the Seventh District of the city of New Orleans. On the morning of March 22, 1893, plaintiff, driving a wagon, attempted to cross the tracks of defendants' road at Josephine street to the river side of St. Charles avenue, and whilst so attempting he was run against by the electric car of the defendants; his horse was seriously injured and damaged, his wagon was broken, himself thrown to the ground and the car ran over his right foot and mashed it. He was taken to the hospital and there, on the same day, his leg was amputated near the knee. The plaintiff declares that he suffered great mental and physical pain and would continue to suffer for a long time, and had been very helpless and would be unable thereafter to follow his occupation and trade of a plumber and fitter of gas fixtures. That he had incurred great expense for medicines, medical and surgical attendance. That he was thus injured and damaged without any negligence on his part; that the injury, damage and accident was caused wholly by the want of care, the ignorance, negligence, unfitness and recklessness of the defendants and their emyloyees, who were in charge of the car at the time, and also by the imperfect and defective equipment of the car; that the persons in charge of the

car could have avoided the accident had they used proper care and diligence.

The case was four times tried—three times before a jury and finally before the court without a jury. On the first trial the jury, not being able to agree, were discharged. On the second trial a verdict for plaintiff for ten thousand dollars was returned, the jury standing ten to two. A motion for a new trial, on the ground that the verdict was contrary to the law and the evidence, having been granted, the jury on the third trial, by a vote of nine to three, found a verdict for fifteen thousand dollars for the plaintiff. This verdict was, on motion, set aside by the court on the same grounds as were assigned against the second verdict.

Plaintiff then waived a jury and judgment was rendered by the court on the fourth trial in favor of defendants, and plaintiff appealed.

The opinion of the court was delivered by

NICHOLLS, C. J. The defendants own and operate a line of electric cars in the city of New Orleans, with double tracks. The tracks, which commence at the intersection of Baronne and Canal streets, turn to the left toward the Mississippi river at Delord street, continue on that street until they reach St. Charles avenue, when they turn into the avenue and extend to what was formerly the village of Carrollton. In connection with the main line are two branches, one at the intersection of St. Charles avenue and Jackson avenue, the other at the intersection of St. Charles avenue and Napoleon avenue. All the cars in going up—that is, from Canal street to Carrollton—run up the right hand track, and in coming down to Canal street they take the other or left hand track.

The cars which go through to Carrollton are painted green; those which turn off at Jackson avenue and go to the river on that avenue are painted red, and those on the Napoleon avenue branch are yellow. The branch cars do not simply make connection at Jackson and Napoleon avenues, but run through to Canal street. St. Charles avenue is made up of two streets, separated from each other through their length by a strip of land of some width, known as the "neutral ground." Defendants' double parallel tracks are on this neutral ground. The side of St. Charles avenue next to the right hand track

going toward Carrollton is known as the "Lake" or "Woods Side" of the avenue, that next to the left hand track is known as the "River Side." Jackson avenue crosses St. Charles avenue at right angles, or nearly so, the streets parallel to Jackson avenue, and just below it are, first, Josephine street, then St. Andrew, St. Mary and Felicity. At Felicity the avenue curves somewhat, and by so curving causes the cars when below that street to pass out of the view of persons standing on the Josephine street crossing of St. Charles avenue. The squares or blocks of the city are usually about three hundred feet in length. State vs. Berard, 40 An. 172; State vs. Natal, 42 An. 613.

Plaintiff's version of the accident is that he was driving his wagon down on the "lake side" of St. Charles avenue, intending to cross over to the "river side" at Josephine street, and continue down the avenue on that side. That when between Jackson avenue and Josephine street, facing down town, he looked down the track to see if any car was coming up, and saw none. That he then looked to his right and rear to see whether any car was on its way down, above Josephine street. That he noticed a red car was moving down between Jackson and Josephine streets—that, from its distance and speed, he was satisfied he could turn into the crossing at Josephine street and pass over, without danger from that car. That he accordingly placed his wagon on the crossing, and was moving across, when the red car, contrary to custom and to regulations, coming directly opposite to him, came to a dead stop upon the crossing itself, in order to take on two ladies as passengers. That the car, being in front of him, his further way across was blocked. That, when matters were in this situation, his attention was drawn to the noise of the wires above his head, and looking down town, or to his left, he saw about four hundred feet from him a green car coming on the uptown track with great speed toward him. That, recognizing the danger of his position, he immediately endeavored to withdraw his horse and wagon from the track. That he was unable to do so in time to avoid a collision, by reason to a very great extent of the asphalt at the Josephine street crossing having been dug up, and the planking between the railroad tracks removed, and of the further fact that the rails projected above the ground, and there were deep ruts on the lake side of the right hand tracks. We have examined the testimony on the subject of the position of the red car at the time

of the accident with the greatest care, and it establishes overwhelm-ingly the fact that the red car had not reached the Josephine street crossing when the collision occurred; that it was above Josephine street at that time; that when it did stop it was not for the purpose of taking on passengers, but enabling those already upon it to go to the scene of the disaster; that if at any time it blocked the crossing (which is very doubtful) it only partially blocked it, and that was after the accident; that the lady who was referred to by several witnesses as having gone into the red car at Josephine street was Mrs. Howe, a passenger in that car, who returned to it after having left it to go to the assistance of the wounded man.    Defendants' wit-nesses, by whom these facts were sworn to, are of the highest re-spectability, entirely without interest or bias in the matter in respect to which they testified, and having exceptional opportunity and occasion to observe and to know of what they speak.

We substantially quote some of this testimony.

E. W. Rodd, sworn, said that at the time of the accident to the plaintiff at the corner of Josephine street and St. Charles avenue, he was standing on the lower river side crossing waiting for a car to go down; he saw a car coming; it was the car he was waiting for; it had just come around the curve at Jackson street, and was stopped out of the curve; it was the nearest car to him; that standing at the lower street corner, he was, at the immediate moment of the accident, looking up in the direction of the red car, which he was waiting for, and did not notice at all the green car coming up. All of a sudden he saw this wagon across the street, and almost sim-ultaneously this green car came up the street and struck the horse. It knocked the man and boy, who were on the wagon, off their seats, and as well as he could see, the man struck the telegraph pole and fell between the telegraph pole and the track, and the car was stop-ped then, at this pole.    As soon as he saw the accident he ran over and saw the man was badly hurt.    He went over to Ballejo's grocery and made them telephone for the ambulance.    He returned then, and took the car, and went down.    The green car was moving at a very rapid rate—the ordinary speed, he supposed.    It was just on the other side of the crossing when this wagon started to cross the street and struck it.    He judged the motorman had only a part of the distance of the crossing of Josephine street to stop his car in order to avoid a collision.    The wagon or horse occupied a portion of

the crossing. * * * The moment the horse stepped on the track the green car had reached the lower crossing of Josephine street—the passage way for a walk across. He could not see how the man on the wagon could, in the face of that car coming right down on him, attempt to cross the street, because the car was certainly not over, he thought, fifty feet from him when he attempted to cross, and as the car was coming from the opposite direction, in which he was driving, he could not see how he could miss seeing it. When he saw that, he saw that an accident was inevitable. The red car was then about midway, he thought, between Jackson avenue and Josephine street. It was not near the crossing. There was nothing on the crossing in front of the plaintiff to prevent him from going across— he had a clear track. * * * The red car stopped before it got to Josephine street. He was watching the red car coming down.

Sheppard, the motorman on the red car, said it (the red car) was going down St. Charles street; it had just come out of Jackson street behind a green car. He met a green car at the intersection of the St. Charles avenue corner and stopped to let it go down. He was going slowly behind it in order to let it get five hundred feet ahead of him before going at his regular speed; of course that brought him a little distance into the intersection of Jackson and St. Charles. He saw the accident. When he had got possibly two-thirds of the distance down the block, may be half the distance down the block, his attention was diverted from the green car immediately ahead of him to the up-town track, and the first thing he saw was a wagon and horse hitched to it. He did not notice the man particularly at first, but he saw the horse. The horse was then ten or fifteen feet from the outer rail of the up-town track. He looked over the horse's head and about the same distance from the centre of the crossing where the horse was headed to, he saw the green car. The horse and the driver were headed rather toward the witness than directly across the street. The driver (the plaintiff) was looking at the witness, and witness was just about to turn his current on and increase his speed when he saw the man. He did not turn the current on because he thought he would allow the man to pass him. Then he saw the green car coming up. It struck him immediately there was danger there, and the man came on and the green car came on and the collision took place. * * * The green car struck the shaft rather between the rump of the horse and the forewheel;

the concussion threw plaintiff over the dashboard. He struck the. telephone box and rebounded from the box to the side of the car and witness' car (the red car) approaching, the witness, passed out of sight, because the red car passed down alongside of the green car. Everybody in the car that saw it jumped up and exclaimed this, that and the other. Witness did not want to run the risk of anybody jumping out of the car, so just above Josephine street— just above the crossing—he brought his car to a stop with the tails of the two cars together. He pulled the gate open and stepped out on the grass, and Mr. Holyland (the conductor) in the meantime had run up to the little boy. The red car (his car) stopped before it got to Josephine street, just above the foot walk, or possibly two feet of it. He was half way between Jackson and Josephine when he saw the plaintiff watching him. On cross-examination he said that his car stopped above Josephine street; that he stopped after and not before the accident; that he did not stop to take on passengers at Josephine street; that if any ladies got on his car at Josephine street they got on while he was off.

*Mrs. Howe* testified that she was a passenger on the red car. She was sitting on the lake side of the car, looking out of the window. She saw the accident. When the accident happened, the red car had not got to the crossing. She knew this, as she was looking out of the window before the car stopped, and she saw the boy lying there, and she got out and put her hand on him and saw that he was senseless. The red car stopped just before it got to Josephine street, almost opposite to where the parties were lying. She was looking out of the window, and saw the plaintiff lying on the grass, then the car stopped, and witness got out and went to him. The red car had not got to the crossing at all. She was as positive of that as she was of her living.

*William Palfrey*, cashier of the New Orleans National Bank, testified he was a passenger on the red car going down—he did not see the accident itself, but saw only the effects of it. The red car was going down town. At the time of the accident, it was above Josephine street. When he . saw the wounded · man lying on the street above Josephine street, the red car had stopped above Josephine street.

*Simon Weiss* testified he was a passenger going down town in the red car—he did not see the accident itself, but was in the car at the

Snider vs. Railroad Co.

time—he heard the crashing and the shouting—at the time of the accident the red car was, he imagined, about sixty feet above Josephine street, and stopped a few feet before it reached that street—it stopped on the up-town side of that street, between it and Jackson street. It did not occupy any part of Josephine street. He was positive of this, because when he got up to see the result, when the car stopped, he saw the man lying on his back on the grass, and the car was at a stand-still, and that was very nearly opposite his own (position). It could not, according to the space and distance, have crossed over Josephine street, when the car was stopped there—he was positive that the car stopped before it reached Josephine. This was not a supposition on his part, but a positive fact.

*G. Westerfeldt* testified he was walking down St. Charles avenue, opposite to the Howard Place, when the accident occurred—saw plaintiff when he attempted to cross Josephine street. There was no car blocking that street when he started to make the crossing.

*Edgar H. Farrar* testified that at the time of the accident he was walking down St. Charles avenue, reading a newspaper, when some one called out in an excited manner that some one was hurt at the corner. He looked up at the corner. There had just occurred a collision between a wagon and a green car, coming up the street. He went to the corner. The tail of the green car was just at or just above the upper crossing of Josephine street. There was another car. There was a red car on the other track, coming down—that car stopped about opposite the green car—it stopped on the upper side of Josephine street.

*J. Tourtarel,* conductor on the green car, testified that the red car stopped about fifteen feet above Josephine street; that the tail end of the cars were about opposite to each other when the red car stopped.

The testimony of these witnesses is fully supported by that of a number of others, which it would serve no useful purpose to particularly refer to.

We have examined carefully the testimony relied on by plaintiff and find it not only directly at variance with the great mass of testimony, but plaintiff's principal witnesses, Roos and Holyland, are both evidently hostile.

The witness White was, by his own account, a passenger on the yel-

low or Napoleon avenue car, and a block and a half away from the place of the accident at the time it occurred. His statements are entitled to no weight; he claims entirely too much knowledge of affairs for the opportunities which he had for ascertaining the facts.

Jones, one of defendant's main witnesses, on this branch of the case, declared he saw the accident. He was on a wagon on Josephine street, behind the plaintiff. The plaintiff went across; a red car coming down stopped on the middle of the crossing instead of on the far side. Plaintiff had plenty of time go to over if that car had gone by. Being blocked, he could not see the green car when he went to start over. The green car ran up on him, hit the foot-board of the wagon, jammed it up against the post, threw Snider out, and his feet fell across the track. The bell did not ring until the man had been run over. No effort was made to put on the brake until after the accident had happened; the green car ran to within fifteen feet of the Jackson street switch. Witness saw the red car stop at Josephine street and block the crossing. Snider was at the time on the asphalt, waiting for the red car to go over. Snider was going over the track when the green car hit him. If the red car had not stopped there Snider would have crossed over. On cross-examination, in fixing his own position at the time of the accident, he repeated that he was on a wagon on Josephine street, behind the plaintiff, *his wagon heading to the woods;* he was on the *river side* of St. Charles avenue, and he was *going toward the woods.* Snider's wagon was *directly in front of him,* standing on the middle of the asphalt, with just room enough for a wagon to come behind him. Snider moved on at the same time the red car moved on. As the car moved across the crossing Mr. Snider whipped up his horse to drive across behind the car. Witness was looking at the red car at the time. As soon as the car started he (witness) looked up town to see if another car was following the red car. There being none, he was going to drive over too, but he saw the green car, but Snider did not. The car was coming from down town at the rate of twenty-three or twenty-five miles an hour. When the green car was twenty feet above St. Andrew street, Snider was just across the track. His horse's head was between the two tracks; he was on the *river side* track and *had not yet reached the wood side* track. He was hitting his horse, trying to cross the track. He was not heading to the woods,

but was going to head up town. He had not seen the green car *blocked by the red car.* Had Snider looked up and down the track, as witness did, he could not have seen the green car, as *the red car was right* blockading him and he could not see it. Snider was sitting on his wagon in the middle of St. Charles avenue on the asphalt, and he started across to the woods as soon as the red car moved across the crossinn—he could look up the track but could not look down, because the car moved on and hid the car—the green car—he went across covered by the red car. On re-examination the witness stated that he had reached Josephine street from Coliseum street—he came from Coliseum, between Sixth and Washington—he was *on the river side* on Josephine street to clear the crossing—he had gone down Josephine street headed toward the woods—he came out Coliseum street to Jackson, on Jackson to Prytania and as St. Charles and Jackson were blocked, he took Prytania, to Josephine street. Snider had come down Josephine street headed to the woods. Witness saw Snider before he (witness) got to the corner of Josephine. He saw him within thirty feet of the corner. He was ahead of the witness. Plaintiff attempts to explain this testimony by saying the witness was a stranger in the city, and did not know exactly the description to give to places, but the minute statements made by him as to where he came from and where he was going, does away with the possibility of any mistake by the witness. Jones' account differs so radcally from that of all others, that it should be disregarded entirely in reaching conclusions in the case.

Having determined that the position of the red car at the time of the accident did not enter as a factor in the case, we have now to examine the other grounds upon ]which plaintiff seeks to recover.

He claims that the injury received by him was caused wholly by the want of care, the ignorance, negligence, unfitness and recklessness of the defendants and their employees, who were in charge of the car at the time, and also by the defective and imperfect equipment of the car; that the persons in charge of the car could have avoided the accident had they used proper care and diligence.

In his supplemental petition he says: "If the red car had not blocked the crossing at Josephine street, and the green car had not been running at an extraordinary and dangerous speed, and if its motorman had been efficient and competent and careful, and if its brakes had been in good working order, and properly and timely

applied, the accident and damage to petitioner would not have happened, and defendants and their agents could have avoided the accident."

A mass of testimony was taken to establish the fact that Sanders, who was acting actually as a motorman upon the green car, had not yet been received and paid as such by the company, but was, at the time, merely being taught the duties of the position by Roos, the regular motorman, and that he was inexperienced and inefficient; that the shoes of the green car were worn out, and by reason thereof it could not be quickly stopped, and that the car was being run at a dangerously rapid rate.    The conclusions we have reached as to the actual cause of the collision would make it unnecessary for us to express any opinion as to whether Sanders was inexperienced and inefficient or not; whether the shoes of the car were worn or not, and whether the rate of speed was dangerous or not, for however reprehensible it would have been in the defendant company to have permitted cars to be run upon their road with defective appliances, to have allowed incompetent persons to serve as motormen, and to have their cars run at improper rates of speed, they would not have become liable by the mere existence of that condition of things to every person who might receive personal injuries by collision on their road.    In order that these facts could have a legal bearing in this case it should appear that the injury received was the result of the breach of duty (Nivette vs. New Orleans and Lake Shore Railroad Company, 42 An. 1153; Clements vs. Electric Light Company, 44 An. 694).    In our opinion the question of the experience of the motorman, the condition of the brakes and the speed of the car had nothing whatever to do with the collision, for had the motorman been perfectly experienced and careful, the brakes in thoroughly good condition and the car running at an unquestionably proper rate of speed, th₃ collision would none the less have inevitably happened. The plaintiff has received painful injuries which will permanently disable him from p operly attending to the discharge of the labor on which he relied for a livelihood, but we are forced to say that the blame for his situation rests upon himself.    He imprudently and recklessly placed his horse and wagon across the track of the defendant company, directly in front of an approaching car, and when it was so close upon him that nothing could have saved the situation (Blakeslee vs. Consolidated St. Railway Co., 63 N. W.

Rep. 401, 402). We think it proper to say that there is nothing in this record going to show a want of proper care and vigilance on the part of Sanders, in discovering the danger of the situatior, or a want of timely effort on his part to avert it. *Ryan vs. Railway, 44 An. 809.*

We are of the opinion that the danger was seen as soon as it was possible to see it, and that the motorman, on seeing it, made instantly every exertion to avert it. In our opinion escape from the collision was impossible. The plaintiff says that before venturing across the crossing, he looked down the track and saw no car coming up, but it is evident that he must have done so a considerable time before he actually crossed, and that he must have directed his attention, after he had once looked down, exclusively to what was occurring above Josephine street, on what is known as the down town or river side track upon which the red car was approaching. The curve by which the view below upon the lake side track is masked is at Felicity street, two blocks below Josephine street, and therefore the green car must have been below that curve when plaintiff last looked in that direction. It is a well recognized rule that a person before attempting to cross the track of a steam or electric car should look to ascertain whether prudently the crossing should be attempted (Blakeslee vs. Consolidated Ry. Co., 63 N. W. Rep. 401, 402). The rule contemplates that this should be done at a time and place when the reason upon which it is founded should be effective. When the law requires steps of diligence and caution, it will not be satisfied by the substitution therefor of vain and useless acts. Plaintiff might as well have not looked down the track at all as to have done so when the green car was masked by the Felicity street curve (Howe vs. Minneapolis, St. Paul & S. S. M. R. Co., 64 N. W. Rep. 103). The gong upon the car is shown to have been properly sounded. The motorman upon the car had no reason to anticipate that plaintiff would attempt to cross the street under existing conditions, while plaintiff knew perfectly well that the moving car was bound on its regular trip up to a point above that street on a fixed line, and must therefore inevitably cross the path he was taking as he moved across. The motorman upon a moving car may well have doubts as to whether the driver of a wagon might intend to cross his track or not, but the driver of the wagon can not but know that the purpose of the motorman is to carry his car across the street on to its

destination unless there should be some reasonable ground for his stopping or slacking his speed.

There was nothing in this case to place the motorman upon his guard or make him suppose that plaintiff would seek to cross.

Plaintiff cites the case cf N. O. & Texas Ry. Co. vs. French, 69 Miss. 1.1 (12 Southern Rep. 338), as going to show that although railroad companies may be allowed to run their trains at a given rate, yet it is a question determinable by circumstances whether that speed be consistent with caution. We do not question the correctness of that proposition; on the contrary, we unhesitatingly declare that authorization or permission given to a company to run its trains at a certain rate of speed would be no protection to it for running at that rate when circumstances would make its doing so inconsistent with proper care and caution. The defendants' car was not, in this case, being run above the authorized speed, and there was nothing in the circumstances connected with the Josephine street crossing which would call for its running at slower rate than it was then doing.

We have examined the testimony in this case with special care. We think the judgment appealed from is correct, and it is therefore affirmed.