(66 South. 339)

No. 20046.

BOFILL v. NEW ORLEANS RY. & LIGHT CO.

(Oct. 19, 1914.)

*(Syllabus by the Court.)*

1. NEGLIGENCE (§ 93*)—IMPUTED NEGLIGENCE —COLLISION ON STREET.

Where a person is riding in a vehicle, driven by another, but of which, and of the driver of which, he has entire control, the negligence and inexperience of the driver are imputable to him.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 147–150; Dec. Dig. § 93.*]

2. STREET RAILROADS (§§ 98, 99*)—RAILROADS —COLLISION—LIABILITY.

The recognized rule is that, before attempting to cross a railroad track, a person should stop, look, and listen, and, where it appears that a police patrol wagon was driven, at a brisk speed and without stopping, from one narrow street into another narrow and intersecting street, upon a railroad track, on which the driver might have expected to see, and did see, an electrically propelled car approaching; and it further appears that, notwithstanding that the motorman in charge of the car did all that could be done to avert it, there was a collision, in which the officer in charge of the wagon was in-

jured, there can be no recovery from the owner of the car on account of such injury.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 204–208, 209–216; Dec. Dig. §§ 98, 99.*]

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

Action by John W. Bofill against the New Orleans Railway & Light Company. From judgment for plaintiff, defendant appeals. Reversed and dismissed.

Hall, Monroe & Lemann, of New Orleans, for appellant. A. A. Calongne and Woodville & Woodville, all of New Orleans, for appellee.

### Statement of the Case.

MONROE, C. J. Defendant appeals from a verdict and judgment awarding plaintiff $500 as damages for personal injuries sustained by him whilst riding in a patrol wagon, and by reason of a collision between the wagon and a street car. Plaintiff answers the appeal and prays for an increase in the amount of the award. The undisputed facts and the testimony from which the others are to be deduced are as follows:

Plaintiff was a police officer in New Orleans and was on duty at the Third Precinct station at about 1:15 o'clock on Christmas morning, 1911, when a call for police assistance came from the corner of Burgundy and Bienville streets, and, being ordered to respond thereto, he took the patrol wagon, with George Shorey, as driver, and went to the scene of the trouble. When they reached their destination, other officers turned over to plaintiff a couple of men whom they had arrested for fighting, and, as he carried them, in the wagon, through Bienville street, on the way back to the station, they continued their altercation, in a language with which he was unacquainted, and he kept his eyes on them, in order to be prepared for anything that they might undertake, for which reason, and also because there was a screen, or storm apron, between him and the driver, he did not see ahead of the wagon, and was unaware of the happenings which immediately preceded the accident, and of the accident itself, until he found himself in the midst of it. Shorey, the driver, was rather inexperienced in his particular line of duty, having been engaged in driving a patrol wagon for only about a month, and that in Algiers, though he states that he came over to this side of the river several times during that month. Plaintiff, however, seems to have considered that he needed admonition, and he says in his testimony:

"Mind you, I had charge of that wagon, and it was my instruction to the driver, that night, being that he was taken from Algiers over here, to see that he was careful going over the crossings, and to sound his gong."

The driver is shown to have sounded his gong as he left Burgundy street, and also as he crossed Dauphine street, but it is not so certain that he did so as he approached Bourbon street, where the accident occurred. It is quite certain, however, that he drove along Bienville street at a gallop, or a trot, and, though he may possibly have slowed his horses down to a walk when he entered Bourbon street, or when they reached the car track on that street, it is an admitted fact that he never at any time stopped them. Beyond that, it is shown, without contradiction, that the wagon was provided with a cover or hood, which extended over and, to some extent, concealed him, and which must, as we infer, have prevented him from obtaining a very good view of his surroundings, and particularly of objects which approached from the sides. Be that as it may, he drove his horses straight upon and across the car track, and in that situation a street car, moving on the track from the direction of Canal street towards Esplanade avenue, struck the wagon on the right front wheel, with the result that the pole and two front wheels became detached, and were·

carried off by the horses, and the body of the wagon—the forward end having dropped down—was pushed around to the left, against the curb at the lower, lake side, corner, plaintiff and his prisoners being thrown forward in a heap and plaintiff receiving the injuries of which he complains.

Lee, a witness called by plaintiff, was on Bienville street, not far from the corner of Bourbon, and as the patrol wagon came along he stepped out into the street to see what passengers it was carrying, and, following it with his eyes, saw it enter Bourbon street and collide with the car. He says that the horses were galloping, and rather leaves the impression that he meant to say that they galloped into Bourbon street. Brown, another witness who appears to be without interest, was called by defendant. He was sitting in the offending car, on the front cross seat on the right side, next to the aisle. His attention was attracted by the action of the motorman in handling his controller or brake, and by the flash which resulted from the blowing out of the fuse (?) when the power was reversed, and, looking, he saw two horses of the patrol wagon coming from Bienville into Bourbon street. He saw "it [the wagon] was coming pretty fast. The horses had gotten right at the corner, just like a shot, you know." He also testifies that the motorman "turned on his brake 50 feet from Bienville street," and that when the car was stopped the rear end was, perhaps, three feet below the lower crossing. Jaunot, the motorman, testifies that he had thrown off the power, in approaching Bienville street, and that he saw the heads of the horses emerging from that street when he was about 40 or 45 feet distant from the corner; that the horses came out in a slow trot, and that he did all he could to stop the car, and so far succeeded that the impact was light, no damage whatever having been sustained by the front of the car, which pushed the body of the wagon to the left, and against the curb, and stopped at about the usual stopping place on the lower (projected) property line of Bienville street. The testimony of Soulabere, the conductor, is corroborative of that given by Brown and Jaunot, as is also that of Neel, with respect to the position of the car when stopped; Neel being a motorman in the defendant's employ who happened to be walking on Bourbon street, in the direction of Bienville street, and about 100 feet above Bienville. Shorey, the driver of the patrol wagon, testifies that when he first saw the car, it was about halfway between Bienville and Iberville streets; that his horses were about going on the track, and that he went on; that after the car struck the wagon, it went on, crossing Bienville street, and "fully 20 or 30 feet into the next square"; that his horses were going in a slow trot until he reached the corner; that he then allowed them to walk, and that they were walking when they passed the property line into Bourbon street; that he then looked towards Canal street, and saw the car; that he could not tell its speed; that he just looked at it, rang his bell, and tried to go on, and that, "just then" the car struck the wagon; that he made no effort to stop his horses, because he saw that there was plenty of time and space to let them go through. He testifies further as follows:

"Q. You saw the car coming just as soon as you got out from behind the property line? A. I could see the light; yes, sir. Q. And, as you saw the light, you had your option to do [either of] three things; you could have tried to cross, which you did? A. Yes, sir. Q. You could have stopped on the lake side, couldn't you? A. I would have stopped if I had thought the car was too close to me. I would have checked the horses and probably backed up. I thought I could go across. Q. If you thought you couldn't get across you would have stopped them and backed them. A. I certainly would. Q. Then the third thing you could have done, you could have turned down Bourbon street, on the lake side roadway and gone down parallel to the car, couldn't you? A. Well, I couldn't very well do that after the car hit. You see, as soon as I saw the car, I judged my distance, and I knew—I thought—I could cross over."

It is doubtful whether Shorey sounded his gong as he approached Bourbon street, and, if he did, no one heard it, save plaintiff and himself. Even Lee, who was on Bienville street when the wagon passed, was unable to say whether a gong that he heard was that of the wagon or the car. Several officers, who came to the scene after the accident, testified that the car was stopped farther down the street than as stated by the witnesses to whose testimony we have referred, but we are satisfied that the officers were mistaken. It was shown that upon the upper, lake side corner of Bourbon and Bienville streets, there stands, flush with the property lines, a three-story brick house, which intervened, and cut off the view between the patrol wagon and the car, as the two approached each other; and it was also shown that the streets are, each but 38 feet 8 inches in width. Plaintiff offered in evidence a rule of defendant company requiring its cars to yield the right of way to the apparatus of the fire department, ambulances, and patrol wagons, and another, requiring motormen to approach street crossings with care, and, whenever practicable, with power off, also to sound gongs before reaching crossings.

## Opinion.

[1, 2] It is beyond dispute that plaintiff had charge of the patrol wagon and control of the driver at the moment of the accident, and the authorities are agreed that in such case the negligence or incompetence of the driver is imputable to the person so situated; and all the more does the rule apply where, as in this instance, such person has reason to know and does know that the driver is inexperienced in the particular work in which he is engaged. Holden v. Mo. R. Co., 177 Mo. 456, 76 S. W. 973; Cain v. Traction Co., 1 St. Ry. Rep. 657, 48 Ohio Law Bul. Sup. 1; Bresee v. Los Angeles Traction Co., 149 Cal. 131, 85 Pac. 152, 5 L. R. A. (N. S.) 1059; Elliott on Railroads, § 1174; Col. & So. R. Co. v. Thomas, 33 Colo. 517, 81 Pac. 801, 70 L. R. A. 684, 3 Ann. Cas. 700; City of Louisville v. Botts, Adm'r, 151 Ky. 578, 152 S. W. 529; 36 Cyc. 1560; 26 Cyc. 1522. It is equally beyond dispute that the driver who participated in the accident out of which this suit has arisen was inexperienced in the particular work in which he was engaged, and that plaintiff knew it; for he so states in the testimony which we have quoted. It is also beyond dispute that plaintiff permitted the vehicle in which he was riding, and of which and of the driver of which he was in control, to be driven without stopping, and (according to the preponderance of the evidence) with little, if any, slacking of speed from behind an intervening brick building, forming the corner of two narrow streets, upon a railway track, laid in the one upon which they entered and over which, to the knowledge of the plaintiff, electrically propelled cars are constantly being operated at comparatively high speed. The driver, as we have seen, says that as soon as he passed out beyond the Bourbon street property line, he looked towards Canal street, the direction from which a car was to be expected, and saw the car coming in his direction, and he was asked, "Did you see anything else about it?" to which he replied, "No, I can't tell the speed; I just looked at the car and rang my bell and tried to continue, but, just then, the car struck me—struck the wagon." From which it is evident that there was scarcely an appreciable interval of time between the moment when he emerged from behind the corner building, standing upon the property lines of the two streets, and the moment when the car struck the wagon—a deduction which is also sustained by the testimony of plaintiff's disinterested witness, Lee, to the effect that the horses were galloping, of defendant's disinterested witness, Brown, to the effect that

they came out of Bienville street "like a shot"; and of the more favorable testimony of the motorman, who says that, when he first saw them, somewhere between the property line and the track (a distance of but 16 feet, 7 inches) they were moving at a slow trot. Beyond that, though defendant is charged with operating its car at an excessive or dangerous speed, the evidence shows that it was not so doing; and it further shows that, from the moment that the motorman saw the wagon, he did all that was in his power to do to avoid the collision. The case, therefore, falls within the rule as enunciated and affirmed by this court in the following, and other, cases, to wit:

"It is a recognized rule that before attempting to cross a track of an electric car a person should look to ascertain whether prudently the crossing should be attempted. The rule contemplates that this should be done at a time and place when the reason upon which it is founded could be made effective. When the law requires steps of diligence and caution it will not be satisfied by the substitution therefor of vain and useless acts." Snider v. N. O. & Carrollton R. Co., 48 La. Ann. 1, 18 South. 695.

"The motorman on a moving car may well have doubts as to whether a driver of a wagon might try to cross his track or not, but the driver of the wagon cannot but know that the purpose of the motorman is to carry his car across the street." 48 La. Ann. page 12, 18 South. page 700.

"The authorities are numerous and uniform to the effect that a person whose business or pleasure occasions him to use the streets of a city which are traversed by electric cars, particularly at street crossings, is "guilty of negligence if he fails to employ proper precautions for his safety. He is bound to look and listen for the approach of cars, and to exercise ordinary care and caution to avoid possible [injury and] danger of a collision. And should he see an approaching car in close proximity, it would be his plain duty to halt until same could pass by, rather than take the risk of an accident by attempting to cross the track in front of it." Dieck v. N. O. City & Lake R. R. Co., 51 La. Ann. 262, 25 South. 71.

"One who reaches a railway crossing on a public highway is under the duty to stop, look, and listen, and if a train be approaching it is his further duty to so act as to minimize the danger and insure his safety, if possible, under the circumstances and conditions then confronting him." Barnhill v. T. & P. R. R. Co., 109 La. 43, 33 South. 63.

"The recognized rule is that before attempting to cross a railroad track a person should stop, look, and listen, and it will hardly do to substitute for it a rule to the effect that, being at a distance from a crossing, towards which he and an electric or steam car are traveling, he may then form an opinion as to which of the two will get there first, and, acting upon that opinion, essay the crossing without giving himself further concern upon the subject. The fact that a street railway company has operated a car at too high a rate of speed will not entitle a party who is injured to recover if it appears that the fault of the company would not have caused the injury save for the supervening and greater fault of the party injured." Heebe v. N. O. & C. R. R. Co., 110 La. 970, 35 South. 251.

We may say, in conclusion: That plaintiff alleges that he sustained a number of quite serious injuries. That the record from the Charity Hospital reads in part: "Patient is brought to the hospital with a severe contusion of chest. The chest was strapped. The patient made an uneventful recovery, and left, cured, January 15/12." That the only physician who was summoned (from the hospital) to testify as to the nature of the injuries was unable to remember anything whatever about the case, and that it was shown that, while plaintiff was disabled, he received his regular pay, to which were added $5 per week from the police relief fund. The jury awarded him $500, but, for the reasons that have been stated, we are unable to concur in the view that he has made out a case which fixes any liability whatever upon defendant.

It is therefore ordered and decreed that the verdict and judgment appealed from be set aside, that plaintiff's demand be rejected, and that this suit be dismissed at his cost in both courts.