No. 673

First Circuit

―

MARTENS ET AL. v. PENTON

―

(October 8, 1930.   Opinion and Decree.)
(December 1, 1930.   Rehearing Refused.)

―

Rownd & Warner, of Hammond, attorneys for plaintiffs, appellees.

Beard & O'Keefe, and A. R. Christovich, of New Orleans, and R. D. Magruder, of Amite, attorneys for defendant, appellant.

ELLIOTT, J. In a collision which took place on the Baton Rouge and Hammond highway between an automobile belonging to Hines Martens, while being driven by Ethel Bell Martens, his wife, and an omnibus which will hereafter be spoken of as a bus, belonging to Martin Penton, while being driven by his son, Ennis Penton, the plaintiff Hines Martens and his wife and three minor children were all seriously injured.

The injuries of Hines Martens were so severe and dangerous that he was forced to undergo treatment for nearly two months in one of the hospitals in New Orleans. He then returned to his home near Hammond, but was compelled to return to the hospital in a short time for further treatment. At the time of the trial, more than a year after the accident, he had not fully recovered and there is evidence in the record that the ankylosis, which remains, will be to some extent a permanent impediment in the use of one of his legs. The expense incurred in the treatment of his injuries and that of his family amounts to nearly $1,000. He claims of the defendant, Penton, $26,054.91 on account of his personal injuries, and further claims of him in separate suits, $500 in behalf of his son Oscar, $1,000 in behalf of his son Harold, and $1,000 in behalf of his daughter Ontie.

He alleges that the collision and the resulting injury to himself and his minor children was caused solely and entirely by the gross negligence, recklessness, and want of skill in driving, and the excessive speed on the part of the driver of the bus.

He avers that his automobile, while being driven by his wife, and in which he was riding, accompanied by their three children, was going southward on what is known as the Baptist road, at a prudent and moderate speed; that as they entered into its intersection with the Baton Rouge and Hammond highway, defendant's bus came from the east, going west, at a high rate of speed and in a reckless and negligent manner, and ran into them on the south side of the highway, after they had turned to the left toward Hammond; that said bus at the time was on the left-hand side of the highway, which was the wrong side for it to be on, going west; that, if said bus had kept to the north side, which was its right side of the highway, it would have passed to the rear of plaintiff's automobile and thus have avoided a collision.

The defendant, Penton, denies the negligence, recklessness, and excessive speed alleged against him by the plaintiff. He alleges that his bus was being driven on the northern side of the highway, going west, at a speed of about 25 or 30 miles an hour; that, when it got within about 60 feet of the place where the Baptist road forms a junction with the highway, plaintiff's automobile, running about 25 miles an hour, without giving any signal or warning and without slowing down, suddenly came into the highway in front of his bus; that his driver, upon seeing it, attempted to avoid a collision by swerving to the left, at the same time applying his brakes, but, when it became apparent that said Martens did not intend to turn to the right or left, but continuously came across on the highway and that a collision was imminent, his driver then swerved to the right and attempted to pass around plaintiff's automobile in that way, but the bus was by that time so close to the automobile that the collision could not be avoided.

Defendant avers that the accident was due solely to the fault, negligence, and want of care on the part of the driver of plaintiff's car; that plaintiff, as master and director of his vehicle, was also responsible for the collision. Contributory and imputable negligence was pleaded against him as a special bar against recovery.

In the suit by Hines Martens personally, there was judgment in his favor against the defendant for $8,554.91, and in that by him for the use and benefit of Harold Martens for $250, and in that for the use and

benefit of Oscar for $100, and in that for the use and benefit of Ontie for $600.

In each case the defendant has appealed.

The minutes show that there was also a suit by Mrs. Ethel Bell Martens against Martin Penton, which made five in all, and we infer that it was for the same purpose, because the suits were all consolidated and tried together. But the suit brought by Mrs. Martens is not before us on this appeal. All the cases depend on the same facts; therefore our opinion in the present case will serve as such in each of the other cases before us on appeal.

The plaintiff-appellee has moved to dismiss the appeal in each case, alleging as grounds that the transcript was not made up, filed, docketed or lodged in the office of the clerk of this court on the return day therefor, nor within three days thereafter, and that no extension was applied for or granted; that, even if the transcript had been timely filed, which was denied, no order of suspensive appeal had been applied for or granted. The record in each case shows that each of the appeals was filed in this court by a deputy clerk of the district court at Amite on April 7, 1930. In point of time this date was all right, but the contention is that the appeals should have been filed by the clerk of the Court of Appeal at Baton Rouge, which is the domicile of the court.

The Constitution 1921, art. 7, sec. 24, authorizes this court to designate such places for the return of appeals thereto as it finds well, in addition to the four places named in the Constitution. This court, in the exercise of this power, designated Amite as the place for the return of appeals from the parish of Tangipahoa. The Constitution 1921, art. 7, sec. 28, designated the clerk of the district court at

these returning points, or his deputy clerk, to act as clerk or deputy clerk of this court until a clerk was appointed. This court has appointed a clerk whose domicile is at Baton Rouge, and he travels with the court and acts as its clerk whenever it is in session. But, due to the fact that we have eight returning points, not counting Baton Rouge, and that two of them are in the eastern and four in the western part of the circuit, we find it necessary to take advantage of the further provision in the Constitution, same section, which authorizes the Courts of Appeal to use the clerk of the district court or his deputy as clerk or deputy clerk of this court, and have continued to use as formerly the clerk of the district court or his deputy, as clerk and deputy clerk of this court, except at Baton Rouge, for the purpose of receiving, lodging, and filing appeals to this court from the parishes returnable in the parish of which he is the clerk of court. It is necessary to do so, because appeals may be due at these various and widely separated returning points on the same day.

These appeals from the parish of Tangipahoa were therefore properly received, lodged, and filed in this court by the deputy clerk of the district court, acting as deputy clerk of this court, for the parish of Tangipahoa at Amite.

Plaintiff-appellee further contends that the appeals were not filed on April 7, 1930, as indicated by the filing, and has produced for our notice a certificate obtained by him from the clerk of court at Amite, bearing date May 7, 1930, in which the clerk of the district court certifies that the date of filing in this court, as appears to have been done by his deputy clerk, was not, in fact, done on April 7, 1930, as certified to by the deputy clerk, nor within three days thereafter, stating further, however, that

these appeals were handled by him as ex officio clerk of the Court of Appeals in the same way and form that he usually handles such cases and as all other clerks have done heretofore.

In connection with this motion, we note that the transcripts of these appeals were certified to by the clerk of the district court as having been made by himself on April 7, 1930, the same day that his deputy clerk indorsed them as filed in this court. As the transcripts were each then in his hands, they were then, for practical purposes, lodged with him at Amite, and the date of filing by his deputy, acting as a deputy clerk of this court, corresponds with the date of his certificate to the transcript. Also the clerk's certificate of the 7th of May, 1930, does not state matters which may be established by his certificate. It therefore has no effect as against his official act by his deputy, according to which the appeals in each case were by him filed in this court on April 7, 1930.

There is no motion to remand for the purpose of having the matter investigated contradictorily with the appellant. The showing made by the clerk's certificate of May 7, 1930, does not justify an ex officio remand for the purpose of investigation, and does not authorize the dismissal of the appeals. The ground that the appeal should be dismissed because the court in granting the appeal named $100 as the amount for which bond was to be given for both a devolutive and suspensive appeal must be likewise overruled. As there is an order in each case for a devolutive and suspensive appeal and bond in each case for the amount required by law for a suspensive appeal, the order and the bond sustains the appeal and there is no ground for dismissing it. Succession of Bey, 47 La. Ann. 219, 16 So. 825.

The law, Code Practice, art. 898, provides that an appeal is not to be dismissed on account of error or irregularity in the order granting it. It is not necessary for the court, in granting a suspensive appeal, to designate in the granting order the amount required for a suspensive bond. When the judgment, as in this case, is for a specific sum of money, the amount of the bond is fixed by law. It is not claimed that the bond in any of the cases is for a sum less than the sum fixed by law for a suspensive appeal. Pan-American Bank & Trust Co. v. Ransom, 150 La. 142, 90 So. 548.

The order granting the appeal in proper terms being present, the character of the appeal is fixed by the amount of the bond, and the time within which it is filed. Succession of Keller, 39 La. Ann. 579, 2 So. 553; Act No. 163 of 1898, sec. 6.

The motion to dismiss is overruled.

On the merits of the case, the district judge did not file written reasons for his judgment.

The place where the collision took place is not on the new but on that part of the old Baton Rouge and Hammond highway which between Hammond and Albany runs a mile or more south of the Baton Rouge, Hammond & Eastern Railroad and south of the station on the railroad called "Baptist," the place being situated in the parish of Tangipahoa. The road referred to as the Baptist road is a public road which leads from the station and settlement so called and forms a junction with the Baton Rouge and Hammond highway about 5 miles west of Hammond. The Baptist road is not, according to the evidence, a frequently used road; its use is largely limited to people going to or coming from the settlement in question. Its junction with

the highway is of course well known to residents of the vicinity, but, due to the proximity of buildings, trees, bushes, and shrubbery, the junction would in most cases not be noticed by people only occasionally passing along the highway in automobiles. The place was well known to the driver of defendant's bus because of the frequent use made by him of the highway. It is a dangerous place, however, for automobiles passing it on the highway at fast speed, because, due to the adjacent shrubbery and trees, an automobile coming out of it into the highway must get on the highway before it can be seen by them, particularly if going west. Its automobile traffic, however, is not frequent enough to justify regarding it as a place of well-known danger, and dangerous to the extent that defendant, passing on the highway with his bus which is not as manageable as a lighter vehicle, should, in expectation of an automobile coming out of it, have slowed down and placed his omnibus under such control upon coming close as to be able to stop immediately in case an automobile should appear. Mrs. Martens, wife of the plaintiff, was driving; Mr. Martens, plaintiff, was seated with her on the front seat; their three minor children, Ontie, Harold, and Oscar, were with them in the car.

They entered on the north, and started to cross to the south side of the highway. It was necessary to do so because the south side of the highway was their right side in going east toward Hammond, and the turn toward Hammond required a left-hand turn on the highway.

Hines Martens, the plaintiff, in explaining how the accident occurred, says that they came to the highway, his wife driving, at about 7 miles an hour; that he saw the bus just as she entered the intersection; that the bus seemed to be about 100 feet ahead of them to the east, and was coming on their side of the road, by which he meant the south side, as that would be their side after turning toward Hammond. He says he warned his wife to keep on her side of the road; that the bus cut in front of them and then hit them on the side; that the bus tried to pass on their side of the road, meaning on the south side of the highway, and that it never would have hit them if it had stayed on its side of the road, by which he meant the north side; that the car did not stop as it got upon the highway; that his wife only slowed down; that, when his wife came into the intersection, she started across to her side of the road, meaning the south side; that the collision occurred just as his wife had commenced making the turn. Mr. Martens, although he had stated that he saw the bus upon entering the intersection coming on the south side of the road at a distance of about 100 feet, when asked the direct question, if his wife came to a stop, and in what direction she was looking when she went on the highway, said that she did not come to a complete stop, and that he did not know in what direction she was looking. But in answer to subsequent questions he makes it plain and states it more than once, and in a way in which his meaning cannot be misunderstood, that he did not see the bus until his wife had crossed to the south side of the highway and had commenced to make a left-hand turn toward Hammond, at which time he says he looked and saw the bus coming in the highway, on the left-hand side, distant about 100 feet; that the rear end of his automobile was in about the center of the highway, his car at an angle to make the turn so as to straighten out on his side of the road. In saying, "On my side of the road," he meant the south side, which he had reached, and on which his automobile

was making or about to commence a left-hand turn at the time it was hit.

He further makes it plain that shrubs and trees alongside of the road, meaning the highway, prevented him seeing the bus when he first reached the intersection and looked up and down the road.

"Q. But when your line of vision first came on the outside of this clump of trees and shrubs so that you could see the Hammond Highway, you looked then and did not see the bus?

"A. As I got on to the middle of the road I did see it.

"Q. And you say that this bus hit you a glancing lick?

"A. Yes.

"Q. Was the bus turned toward the right as it hit you a glancing lick?

"A. Yes."

Mrs. Martens, when first questioned, stated substantially as did her husband, that she slowed down as she entered the intersection to about 7 miles an hour; that she saw the bus coming when she entered on the highway, about 100 feet distant; but she made it plain, when further questioned, and in a way in which her meaning cannot be misunderstood, that she did not see the bus until she had crossed to the south side of the highway and had started making a left-hand turn toward Hammond.

"Q. What did you do when you saw the bus, tell the court?

"A. Well, I drove into the highway and just started to make my turn toward Hammond when I saw the bus, but I thought I had plenty of time to reach my side of the road, and the bus could stay on its side of the road and go behind us without hitting us."

She further states that at the time she saw the bus it was on the left-hand side of the road, by which she meant the south side; that the rear end of her car was at the time in the center of the road and the front turning a curve to the left.

"Q. When the seat of your car when you were driving and your hands were on the wheel, got opposite this fence at Big Charlie's did you look toward Hammond for the bus?

"A. I only saw the bus when I got out in the road; I didn't see it until I did get out in the road.

"Q. Are you positive?

"A. Yes.

"Q. I show you a photo which I am going to mark 3. This photo shows the road you were on, the Baptist road. This road, pointing to the Hammond & Baton Rouge Highway, is the Baton Rouge & Hammond Highway: This is Big Charlie's house (pointing to house on photo) and this is the fence I am referring to, which runs in front of his place. When you got out here (pointing to property line) when your front wheels were even with this fence that runs in front of Big Charlie's house, did you look, and did you see the bus?

"A. No, I could not see for the bushes. I did not see it when I reached the fence.

"Q. Is it not a fact that if you are even with the fence, the fence and the bushes do not obstruct the view—the bushes behind Big Charlie's fence?

"A. No, I could not see for the bushes.

"Q. Not until you drove into the highway?

"A. I did not see the bus until I got into the highway.

"Q. How far were you into the highway when you saw the bus?

"A. I was just making the turn.

"Q. Are you positive you were just making the turn?

"A. Yes, I am positive.

"Q. You were in the middle of the road?

"A. Yes.

"Q. That being the first time you saw the bus, how far was the bus away from you?

"A. About 100 feet."

Another witness in the case familiar with the situation at the place of junction testified that coming out of the Baptist road into the highway you have to practically get

into the highway before you can see anything coming on it from toward Hammond. The testimony of this witness and of Mr. and Mrs. Martens therefore supports that of Ennis Penton and other witnesses called by the defendant, all of whom agree that a party coming in an automobile on the highway toward Hammond at, say, 35 miles an hour, cannot see an automobile coming on the Baptist road until it enters on the highway. Therefore the testimony of defendant's driver that the residence, fence, trees, bushes, and shrubbery at the place prevented him from seeing plaintiff's automobile until it got into the highway is substantiated by all the evidence in the case. Defendant's driver further testified that he was about 60 or 65 feet distant, driving at about 35 miles an hour, and that it was impossible to stop his bus after seeing plaintiff's car in time to avert a collision. The only evidence as to the distance within which this passenger omnibus could be stopped when running, say, 35 miles an hour, is that of Ennis Penton. He says that it can be done in about 70 feet; his estimate is somewhat supported by the fact that it did stop within 7 or 8 feet after contact with the Martens' car.

Both Mr. and Mrs. Martens say that they slowed down upon entering the highway, but kept on across without stopping. Penton, Burns, and Dumas say that, when plaintiff's car first appeared in front of the bus, it slowed down and acted as if it was about to stop, but kept on across the highway; that Penton applied his brakes when the Martens car first came into sight, but, as it seemed that the car was going to stop, he swerved to the left, but, upon seeing that it did not in fact stop, and kept going across, he swerved back to the right, but he was so close by this time that the collision could not be avoided. Penton is not only supported in this by Burns and Dumas, but indirectly by the plaintiff, when he says: "The bus cut in front of us and then hit us on the side. I tried to pass on my side of the road, it never would have hit us had it stayed on its side of the road"—which amounts in effect to saying that the bus was swerved from the north to the south side of the road. Plaintiff's automobile was one of the lighter makes; therefore the contact with it in the open road had but little effect in stopping the forward momentum of the omnibus, and, as the bus stopped within 7 or 8 feet after the impact, it is a proper conclusion that it was fast yielding to its brakes at the moment of the impact.

As the omnibus could not be stopped in time to avert the collision, the proper thing to have been done in the emergency was to pass to the right or left of the automobile, if it could be done. It was the duty of the driver of the bus to do all in his power, consistent with the safety of his passengers, to avoid running it down.

Defendant's driver says that, if the Martens car had not slowed down as it got on the highway, he could have passed to the right of it, but that it slowed down and seemed about to stop, and that he, thinking it was about to stop, swerved to the left.

The act of plaintiff's wife and of himself in slowing down as if they were about to stop, upon getting into the highway, right in front of the oncoming bus, reasonably justified Penton in immediately swerving to the left. As it was impossible to stop and see whether the car was really going to stop, as it seemed about to do, or not, and the intervening distance between the omnibus and the automobile at the time the automobile was first seen was being covered by the bus in an interval of time which was less than two seconds, the driver of the bus had to act on appearances. But

as the Martens car did not stop as it appeared to be about to do, but kept on across the highway, then the bus driver swerved back to the right, taking the last chance in that direction. But he was so close at the time of swerving to the right that a collision was unavoidable.

The duty of swerving from the side of the road on which a party belongs to the opposite side, when doing so apparently affords a chance to avoid a collision, was considered by this court in Penton v. Snell, 8 La. App. 648. The action of the Martens car when it first came out upon the highway misled the driver . of the bus and caused him to do as he did do, in trying to avoid a collision, and therefore the plaintiff cannot blame the bus driver for something which the plaintiff himself brought about.

Plaintiff and his wife claim that the driver of the bus caused the collision by driving on the left-hand side of the highway, which was the wrong side for the bus, going west. Defendant's driver, Penton, Burns, and Dumas all say that the bus was being driven on the right-hand side of the highway, going west, at the time plaintiff's car appeared in the highway, and that it only turned to the left after plaintiff's car had been seen, for the purpose stated by defendant's driver. Plaintiff and his wife are unable to gainsay it, because it is established by them that they did not see the bus until their car had reached the south side of the highway. By the time the Martens car got to the south side of the highway, defendant's bus had ample time to swerve from the north to the south side, all as explained by Ennis Penton, Burns, and Dumas. The testimony of the plaintiff and his wife on one side and that of Penton and Burns and Dumas on the other is therefore not in conflict, because both sides can be true, as a result of their respective statements.

Plaintiff and his wife both state that they looked east and west along the highway as they drove on it and did not see the bus. But the evidence shows that the highway is practically straight at this junction for several hundred yards in both directions. Suppose this bus, therefore, to have been distant 200 feet at the time, instead of 60 or 65, as claimed by plaintiff, and 100, as claimed by defendant, when they first saw it, the plaintiff and his wife were bound to have seen it, if they had looked east upon driving on the highway. It was the duty of plaintiff and his wife on coming out of the Baptist road from behind the house, trees, bushes, fence, and shrubbery which concealed automobiles coming on the highway from their view until they got into it, to pause in a safe place long enough to make sure by looking carefully both ways that there was no automobile coming near enough to endanger them before entering and attempting to make a left-hand turn. They are charged with knowing that automobiles on this frequently used highway have the right of way over automobiles coming into it from a less used public road, such as the Baptist road at its junction with it. In a situation such as the evidence establishes, it is useless for them to say that they looked east and did not see this bus. An object so large and so close at hand was bound to have been seen if they had looked in such way as to accomplish the purpose of looking. It is evident that they did not look until they had crossed to the south side of the highway and had commenced or were about to commence making a left-hand turn. They then saw it for the first time, but too late; the inevitable was at hand. The evidence is such that they must be considered to have entered and

attempted to cross the highway in disregard of what was, to them, an obvious danger.

The present case is similar to Smith v. Interurban Transportation Co., 5 La. App. 704, and Hubert v. Robichaux, 8 La. App. 789. See, also, Bryan v. Magnolia Gas Co., 13 La. App. 52, 127 So. 124.

The plaintiff contends that he got on the highway ahead of the bus and was crossing it before he was struck; that, being the first to enter, he had the right to cross, as he was engaged in doing; that it was the fault of the defendant not to see him and avoid the collision. The rule he contends for applies to street intersections in cities and towns, and to two highways which cross each other in the country. But the Baptist road is not a highway, and furthermore it does not intersect the Baton Rouge and Hammond Highway; it only forms a junction with it.

Plaintiff contends that defendant's excessive rate of speed was one of the causes of the collision. The testimony of Ennis Penton, Burns, and Dumas is that the bus was making, at the time plaintiff's automobile came into view, about 35 miles an hour. The only evidence indicating a faster speed is that of a witness who says that, when he reached the scene of the collision some minutes after it occurred, he heard somebody say that Penton was driving 40 miles an hour. It does not appear from the testimony that Penton was present and heard what was said. It is likely that Penton was present; still the evidence does not show that he was; consequently we are not disposed to regard this testimony as outweighing that of Penton, Burns, and Dumas that the bus was not running that fast.

Plaintiff contends that, as his wife was driving, negligence by her in the way claimed is not to be imputed to him. This position, in our opinion, cannot be maintained. The car in which the plaintiff was riding belonged to him as head and master of the community which presumably existed between him and his wife. Plaintiff was seated by her side, she was driving by his authority. He was not in the sense of the law his wife's guest. Cyclopedia of Automobile Law by Blashfield, vol. 2, subject, "Imputed Negligence," sec, 13, p. 1153; Bonfill v. New Orleans Railway & Light Co., 135 La. 996, 66 So. 339, L. R. A. 1915C, 419; Railroad v. McNulty (C. C. A.) 285 F. 97.

The case Vitale v. Checker Cab Co., 166 La. 527, 117 So. 579, 59 A. L. R. 148, deals with the lack of authority and responsibility on the part of the wife for the fault and negligence of her husband in driving an automobile over which he has the authority of a master, and is therefore not controlling in the present case.

We have concluded from the evidence that the collision in question was not due to the fault and neglect of the defendant, and that the judgment appealed from is contrary to the law and evidence.

For the reason stated, it is ordered, adjudged, and decreed that the judgment appealed from herein be annulled, avoided, and set aside, and the demand of the plaintiff, Hines Martens, is now refused and rejected, at his cost in both courts.